FILED

11/26/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0403

DA 22-0403

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 276

STATE OF MONTANA,

Plaintiff and Appellee,

v.

WILLIAM HOMER McCLELLAN,

Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-20-695
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Tammy Hinderman, Appellate Defender, Gregory Hood, Assistant
Appellate Defender, Helena, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

Matthew C. Jennings, Missoula County Attorney, D. James McCubbin,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  August 21, 2024

Decided:  November 26, 2024

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     McClellan was charged with Criminal Possession of Dangerous Drugs with Intent to Distribute after an officer conducted an investigation that began with a welfare check on him.  The District Court determined the officer had particularized suspicion to expand the welfare check into an investigatory stop, denying McClellan's motion to suppress.  McClellan pled guilty, reserving his right to appeal the denial of his motion.

¶2     We consider:

> *Whether the District Court erred by concluding the officer had particularized suspicion to expand the scope of a welfare check into an investigatory stop under the totality of the circumstances?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     At about 8:40 a.m. on December 5, 2020, an employee of Lucky Lil's Casino in Missoula, Montana called 911 after attempting more than once to wake a man "slumped over" in the driver's seat of a running vehicle parked in the casino parking lot.  Missoula Police Officer Nathan Champa responded, noting that, based on the lack of frost or condensation on the vehicle's windows on a "pretty cold" morning, the vehicle had been running "for a while."  Champa rapped loudly on the car window and successfully woke the driver, McClellan.[1]  Champa reported to dispatch that "male is conscious and breathing, and alert," while motioning for McClellan to roll down the driver's window.

---

[1] The relevant exchange between Champa and McClellan was captured on the body camera worn by Champa.  At the suppression hearing conducted over Zoom during the pandemic, prosecutors experienced technical difficulties playing part of the video, so the parties stipulated to its submission to the District Court.  The District Court confirmed its review of the video in its Order

¶4     Champa testified that, based on his training and experience, he was concerned for McClellan's health and safety:

> [I]t's not uncommon for individuals to be at the casino, you know, or slumped over in a driver's seat where they are so intoxicated that they are slumped over or another medical issue. . . . I've had them before where either a person is passed out for alcohol or a narcotic, you know, or there's medical issues.  So I had basically three ways I was looking at it to find out why this gentleman is passed out in the driver's seat at a casino.

When asked about his general experience dealing with someone who is passed out due to methamphetamine use, Champa stated:

> I mean, based on my training and experience meth has—especially now when it's mixed with Fentanyl and other things—individuals that use methamphetamine can stay up for multiple hours.  And then when they're coming down, they crash hard, meaning they will sleep for multiple hours or a day or more.

¶5     When McClellan came to, Champa asked McClellan if there was a reason he was passed out at the wheel.  McClellan answered, "no, it was just early in the morning," to which Champa replied by asking, "Early in the morning? And it's just normal to fall asleep like that, parked?" to which McClellan said, "uh, honestly, no."  McClellan said he was from "the Bitterroot" and Champa requested to see McClellan's I.D., which McClellan could not find.  Instead, McClellan offered, "I can give you my apple," which Champa declined.  Champa asked McClellan for his name and date of birth, then went back to the squad car, saying "sit tight for me, Will."  Champa attempted to identify McClellan but was unsuccessful because, as Champa explained when he returned to McClellan's window,

---

Denying McClellan's Motion to Suppress Evidence, and it was transmitted to this Court in addition to the other record materials.

photos appearing under his name and date of birth looked "nothing like" McClellan. An ambulance arrived, and Champa asked McClellan if he needed "medics or anything," to which McClellan said, "no, sir." Champa thus waived off the ambulance and cancelled fire assistance.

¶6 Still attempting to identify McClellan, Champa asked him if there was "anything in this car that has your name on it," to which McClellan responded "yeah" and began rummaging around the vehicle. Champa observed a box of what he believed to contain THC lollipops on the floorboard and asked McClellan about the contents of the box.[2] McClellan said the box contained pennies and then voluntarily opened the box. The box contained pennies, but Champa also observed a broken methamphetamine pipe inside the opened box.

¶7 Throughout the entire interaction, McClellan did not produce identification. Approximately six minutes after Champa's first contact with McClellan, dispatch informed him that McClellan's driver's license was suspended. Champa told McClellan: "You've got a couple issues going on. You've got a suspended [driver's license], you're in a running vehicle passed out, you've got a meth pipe or a broken part of a pipe in with your pennies, man, that's drug paraphernalia." Champa requested to search the vehicle, which McClellan declined. He conducted a pat down of McClellan, which yielded a methamphetamine pipe from McClellan's pocket. McClellan was cited with Criminal Possession of Drug

---

[2] In December 2020, marijuana possession was illegal in Montana. *See* §§ 45-9-102, 50-32-222(4)(x), MCA (2019).

4

Paraphernalia and Champa explained he was going to apply for a search warrant for the vehicle and have it impounded.

¶8 Champa obtained a search warrant for the car, which had been rented by McClellan's girlfriend. The search produced a backpack containing baggies of methamphetamine sorted and labeled by weight, along with other drug paraphernalia and McClellan's driver's license. McClellan was thereafter charged with Criminal Possession of Dangerous Drugs with Intent to Distribute. McClellan filed a motion to suppress the evidence gathered by law enforcement after the point at which it had become clear he was no longer in peril or in need of medical assistance. The District Court denied McClellan's motion, reasoning as follows:

> Officer Champa's community caretaker stop ripened into an investigatory stop and frisk based on objective facts, including the suspended license, [McClellan's] state of being passed out and unresponsive in a running vehicle after attempts to wake him before police arrived, and the broken methamphetamine pipe in the vehicle that [McClellan] willingly showed to the officer during the initial contact.

¶9 On the day set for jury trial, McClellan entered a guilty plea. He was later sentenced to ten years in the Montana Department of Corrections, all suspended. McClellan appeals the denial of his motion to suppress.

## STANDARD OF REVIEW

¶10 This Court reviews a lower court's denial of a motion to suppress evidence in a criminal case to determine whether the court's findings of fact are clearly erroneous and whether it correctly interpreted and applied applicable law to those facts. *State v. Hesser*, 2024 MT 134, ¶ 8, 417 Mont. 84, 551 P.3d 277. "A court's findings of fact are clearly

erroneous if they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed." *State v. Vegas*, 2020 MT 121, ¶ 8, 400 Mont. 75, 463 P.3d 455 (quoting *State v. Ruggirello*, 2008 MT 8, ¶ 15, 341 Mont. 88, 176 P.3d 252).

**DISCUSSION**

¶11 McClellan argues Champa exceeded the scope of the community caretaker role but lacked particularized suspicion to conduct an investigatory stop. The State answers that Champa properly approached McClellan under the community caretaker doctrine and thereafter promptly obtained particularized suspicion justifying the expansion of the welfare check into an investigation.

¶12 The Fourth Amendment to the United States Constitution provides citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" without a warrant based on probable cause. U.S. Const. amend. IV; *see also* Mont. Const. article II, § 11. "The fundamental purpose of the Fourth Amendment and Article II, Section 11 is to protect the privacy and security of individuals from unreasonable government intrusion or interference." *State v. Smith*, 2021 MT 324, ¶ 11, 407 Mont. 18, 501 P.3d 398 (citing *State v. Hoang Vinh Pham*, 2021 MT 270, ¶ 13, 406 Mont. 109, 497 P.3d 217). The Montana Constitution also provides citizens with the "right of individual privacy," which cannot be infringed "without the showing of a compelling state interest." Mont. Const. art. II, § 10. "Because of that heightened privacy right, the Montana Constitution affords broader protection against searches and seizures than does the Fourth

6

Amendment alone." *Smith*, ¶ 12 (citing *State v. Bullock*, 272 Mont. 361, 383, 901 P.2d 61, 75 (1995)).

¶13    "[A] 'search' occurs if governmental action breaches a person's reasonable expectation of privacy." *State v. McKeever*, 2015 MT 177, ¶ 14, 379 Mont. 444, 351 P.3d 676.  A seizure takes place when "a government officer in some way restrains a person's liberty by means of physical force or a show of authority that, under the totality of the circumstances, would cause an objectively reasonable person to feel not free to leave the presence of the government officer." *State v. Hoover*, 2017 MT 236, ¶ 15, 388 Mont. 533, 402 P.3d 1224 (internal quotations omitted).  However, not all contacts between police officers and citizens are breaches of fundamental rights.  *State v. Lovegren*, 2002 MT 153, ¶ 13, 310 Mont. 358, 51 P.3d 471.  There are exceptions to the warrant requirement, including the rendering of aid under the community caretaker doctrine and temporary stops for investigative purposes based upon particularized suspicion, which allow officers to briefly seize and question citizens without probable cause.  *State v. Spaulding*, 2011 MT 204, ¶ 18, 361 Mont. 445, 259 P.3d 793 ("[T]he community caretaker doctrine is an exception to the warrant requirement for seizures"); *Hoover*, ¶ 17 ("[A] law enforcement officer may stop and temporarily detain a person for investigative purposes without probable cause for an arrest if, based on *specific and articulable facts known to the officer*, including rational inferences therefrom based on the officer's training and experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity") (emphasis in original).  The rationale for

7

permitting such warrantless searches and seizures is that "'necessarily swift action predicated upon the on-the-spot observations of the officer on the beat . . . historically has not been, and as a practical matter could not be, subjected to the warrant procedure.'" *Spaulding*, ¶ 18 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968)).

¶14 Every peace officer is considered to have "a duty to investigate situations in which a citizen may be in peril or need some type of assistance from an officer." *Lovegren*, ¶ 20. "Many communities look to their officers to assist citizens or render aid under a variety of circumstances. For example, officers often deliver emergency messages, give directions, search for lost children, assist stranded motorists and render first aid." *Lovegren*, ¶ 20 (quoting *State v. Chisholm*, 39 Wash. App. 864, 867, 696 P.2d 41, 43 n.3 (1985)). "The community caretaker doctrine is operative where law enforcement initiates contact with a citizen, not to investigate the commission of a crime, but to investigate a potential vehicle accident or otherwise to ensure the safety of citizens." *Spaulding*, ¶ 18. We utilize the following test to determine if the community caretaker exception applies in an encounter between government officials and citizens:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure which must be justified by something other than the community caretaker doctrine, such as particularized suspicion or probable cause.

8

*Spaulding*, ¶ 21 (citing *Lovegren*, ¶ 25 and *State v. Graham*, 2007 MT 358, ¶ 25, 340 Mont. 366, 175 P.3d 885).

¶15    We have previously analogized the community caretaker doctrine to another warrant exception, the investigative *Terry* stop.  *Spaulding*, ¶ 18 (citing *Graham*, ¶¶ 25-26 ("Analogously, if there are objective, specific, and articulable facts from which a law enforcement officer would suspect that a citizen needs help or is in peril, then the officer 'may temporarily seize [the] citizen, in the absence of a warrant or particularized suspicion, without running afoul of the prohibition against unreasonable searches and seizures contained in the Fourth Amendment to the U.S. Constitution or Article II, Section 11 of the Montana Constitution.'")).  In *Terry*, the United States Supreme Court held that an individual may be briefly seized so long as the seizure is supported by a particularized suspicion of criminal activity justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880.  In Montana, the standard for a *Terry* stop is codified at § 46-5-401(1), MCA:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

An officer "who has lawfully stopped a person or vehicle" may "request the person's name and present address . . . and, if the person is the driver of a vehicle, demand the person's driver's license and the vehicle's registration and proof of insurance."   Section

46-5-401(2)(a), MCA. "An investigative stop under this statute can last no 'longer than is necessary to effectuate the purpose of the stop.'" *Graham*, ¶ 14. The existence of particularized suspicion of wrongdoing "is a factually driven inquiry dependent upon the totality of circumstances." *Graham*, ¶ 15 (citing *State v. Case*, 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849). "'In evaluating the totality of the circumstances, a court should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer.'" *Graham*, ¶ 15 (citing *State v. Martinez*, 2003 MT 65, ¶ 23, 314 Mont. 434, 67 P.3d 207). Thus, "the *Terry* stop and the community caretaker stop are simply different branches of the same principle—both are constitutionally 'reasonable' warrantless seizures because both are grounded in the officer's necessarily swift action or reaction to an on-the-spot situation, limited in scope to the purpose for which the stop is made." *Spaulding*, ¶ 18.

¶16 Particularized suspicion for purposes of a *Terry* investigation can "subsequently arise[]" during the course of a community caretaker stop. *Lovegren*, ¶ 22; *State v. Cleveland*, 2024 MT 214, ¶¶ 18-19, 418 Mont. 147, 556 P.3d 945 ("An officer who contacts a person in a community caretaking capacity is not required to immediately terminate the interaction merely upon initially finding a person to appear well. . . . If, during the course of a community caretaker interaction, the officer develops sufficient particularized suspicion of criminal activity, the officer may continue to ask questions to dispel or confirm those suspicions."). Accordingly, if an officer articulates "more than a mere generalized suspicion or an undeveloped hunch of criminal activity," an initial stop for caretaking can

10

ripen into a permissible *Terry* stop. *Cleveland*, ¶ 19 (citing *State v. Carrywater*, 2022 MT 131, ¶¶ 15, 17, 409 Mont. 194, 512 P.3d 1180).

¶17　There is no dispute McClellan appeared to be in peril the morning of December 5, 2020. The Lucky Lil's employee who called 911 had made several unsuccessful attempts to wake McClellan from outside the vehicle. As the officer responding to the emergency call, it was Champa's duty to initiate a welfare check on McClellan under the community caretaker doctrine. *Lovegren*, ¶ 20. Champa's consideration that McClellan's actions may have been related to alcohol or narcotics rather than a medical issue did not invalidate the purpose of acting as a community caretaker when Champa first approached McClellan. *See State v. Schlichenmayer*, 2023 MT 79, ¶ 20, 412 Mont. 199, 529 P.3d 789 ("There is 'no requirement that the officer's subjective purpose be solely and exclusively to conduct a welfare check.'" (quoting *Spaulding*, ¶ 24)). Indeed, Champa stated he considered all three possibilities in responding to the call.

¶18　McClellan was still asleep or unconscious when Champa arrived. He awoke in a disoriented manner only after Champa knocked loudly and repeatedly on the driver's window. McClellan admitted to Champa that being passed out in the driver's seat of a running vehicle before 9:00 a.m. in a casino parking lot was not normal behavior. Champa then asked McClellan for identification. It is at this point that McClellan contends Champa lacked particularized suspicion of a crime to request his I.D., arguing that "[a]fter determining that Mr. McClellan was neither in peril nor in need of help, and without justification to expand the scope of the stop, the officer's further engagement with Mr.

11

McClellan infringed upon the privacy guarantees of the U.S. and Montana Constitutions." The State argues the request for identification likely did not constitute a seizure within the meaning of the Fourth Amendment because Champa was not restraining McClellan's liberty by simply posing a question, but that, in any event, Champa had particularized suspicion that McClellan was impaired *before* he made the request for identification. We agree with the latter contention.

¶19    In responding to the emergency call, Champa had been advised that the subject male had not reacted to multiple attempts to wake him. As the State explains, this effort "corroborated the suspicion that McClellan had been passed out or impaired, as opposed to intentionally sleeping in the parking lot with his vehicle running." Champa observed McClellan "slumped over" in the driver's seat of a running vehicle on a cold, December morning. When he was able to rouse McClellan, Champa observed his mannerisms and quickly ruled out a medical problem as being the cause of McClellan's abnormal behavior. This left Champa with more than a generalized suspicion or undeveloped hunch of criminal activity; as he testified, the only logical explanation for McClellan's behavior, based on his training and experience, was impairment, and under Montana law, operating a motor vehicle in that condition is a crime. *See* § 61-8-1002(1)(a), MCA ("(1) A person commits the offense of driving under the influence if the person drives or is in actual physical control of: (a) a vehicle or a commercial motor vehicle upon the ways of this state open to the public while under the influence of alcohol, any drug, or a combination of alcohol and any drug"). "[T]his Court has interpreted that private roads and parking lots satisfy the

12

statutory definition of 'ways of this state open to the public' under § 61-8-101(1), MCA." *State v. Krause*, 2021 MT 24, ¶ 16, 403 Mont. 105, 480 P.3d 222. "Actual physical control" can include sitting or sleeping in the driver's seat of a parked, running car. *State v. Hudson*, 2005 MT 142, ¶¶ 16-17, 327 Mont. 286, 114 P.3d 210 (concluding the jury was properly instructed that actual physical control could be evidenced by the defendant being passed out "behind the wheel of the vehicle, with the motor running"). In essence, the point at which Champa realized McClellan was not in need of medical attention was also the moment that particularized suspicion arose that McClellan was operating a motor vehicle in an impaired condition and could thus be breaking the law.

¶20 Champa then properly requested McClellan's identification. Section 46-5-401(2)(a), MCA. When McClellan could not produce a driver's license or any other form of I.D., Champa gained particularized suspicion of another violation, § 61-5-116(1), MCA, which makes it illegal for a licensee to not have a driver's license in their immediate possession for display to an officer "upon demand." As Champa was inquiring about McClellan's lack of I.D., McClellan voluntarily opened a box containing a broken methamphetamine pipe, providing probable cause of drug paraphernalia and further suspicion of not only impairment, but the presence of dangerous drugs. Information from dispatch then confirmed the suspended status of McClellan's driver's license, and Champa had McClellan step out of the vehicle. Champa's pat-down search revealed more drug paraphernalia, for which McClellan was ultimately cited, and led to Champa's seizure and search of the vehicle, which produced dangerous drugs.

¶21 At no time during his interaction with McClellan did Champa operate outside the exceptions to the Fourth Amendment's warrant requirement or unjustifiably breach McClellan's right to privacy. He approached McClellan as a community caretaker and the stop ripened into an investigation based on particularized suspicion under the totality of the circumstances. The investigation's scope expanded only upon Champa gaining particularized suspicion of additional crimes. We recently applied the same rationale to strikingly similar facts in *Cleveland*, where we concluded:

> Though Cleveland was moving and alert, his unexplained behavior and condition, under the totality of these circumstances, gave [the officer] reason to be concerned that Cleveland was under the influence of narcotics. In order to dispel his concerns that Cleveland may get back on the highway to Missoula in an impaired condition, [the officer] was justified in continuing the interaction. His request—30 seconds after engaging Cleveland—for Cleveland's driver's license was a reasonable question to allow [the officer] to continue the interaction and ensure that Cleveland was not under the influence. When Cleveland immediately disclosed that he did not have his driver's license, [the officer] had particularized suspicion that Cleveland was violating § 61-5-[116](1), MCA, which required Cleveland to carry his driver's license when operating a motor vehicle.

*Cleveland*, ¶ 23.

¶22 The District Court's determination that Champa had "sufficient particularized suspicion to lawfully stop [McClellan] for an investigatory stop and frisk after the initial, brief investigation for welfare purposes" was therefore supported by substantial credible evidence and contained no other error of law.

¶23 Affirmed.

/S/ JIM RICE

14

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON