FILED

05/27/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0715

DA 23-0715

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 110

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

TREVOR ROBERTS,

      Defendant and Appellant,

APPEAL FROM:   District Court of the Sixth Judicial District,
In and For the County of Sweet Grass, Cause No. DC 22-26
Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jami L. Rebsom, Jami Rebsom Law Firm PLLC, Livingston, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Carrie L. Garber,
Assistant Attorney General, Helena, Montana

          Patrick Dringman, Sweet Grass County Attorney, Big Timber,
Montana

Submitted on Briefs:  February 19, 2025

Decided:  May 27, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Trevor Roberts (Roberts) challenges two orders entered by the Sixth Judicial District Court denying his motions to suppress for lack of particularized suspicion and to dismiss for violation of double jeopardy, which he reserved the right to appeal following his subsequent change of plea and entry of guilty pleas to two counts of Underage Possession of an Intoxicating Substance (UPIS), misdemeanors under § 45-5-624, MCA.

¶2 We restate the issues on appeal as follows:

1. *Did the District Court err by denying Roberts's motion to suppress after determining that drug paraphernalia inside a vehicle he was using was found within plain view when illuminated at night by an officer's flashlight?*

2. *Did Roberts's conviction of two counts of UPIS—one count for alcohol and the other for marijuana—violate the multiple conviction statute?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On May 22, 2022, eighteen-year-old Roberts attended a post-high school graduation dance known as "Rad Grad" at the Sweet Grass County fairgrounds (Fairgrounds) in Big Timber, Montana. One purpose of the event was to provide an alcohol-free environment and prevent students from partying and becoming intoxicated elsewhere. About 12 hours prior to the event, the organizers requested the Sweet Grass County Sheriff's Office (Sheriff's Office) test for alcohol consumption as students entered the venue. However, due to other pressing matters, deputies were unable to be present at the start of the event. A chaperone called the Sheriff's Office from the venue to confirm deputies would be coming and specifically mentioned that Roberts appeared to be intoxicated.

2

¶4     Deputy Whaley was one of the deputies who arrived at the Fairgrounds later that evening after the dance had commenced. The deputies discussed with chaperones an appropriate way to proceed, after which attendees were asked to step outside of the dance hall and come back inside individually, whereupon they were tested for alcohol by the deputies administering portable breath tests (PBTs). No standardized field sobriety tests were conducted, and PBTs do not detect the presence of other substances. Roberts tested negative for alcohol and thus reentered the hall.

¶5     After the testing, Deputy Whaley left the hall and began walking among the cars in the parking lot to ensure there were no other attendees who were avoiding alcohol testing or would attempt to enter the dance without testing. As he was walking through the parking lot, he saw two individuals, including Roberts, exit the back door of the dance hall and walk toward a vehicle.[1] Deputy Whaley testified he was familiar with both the vehicle being approached and with Roberts, as he and other deputies had conducted traffic stops of the vehicle when Roberts was driving, and he had previously encountered Roberts regarding "numerous traffic related and MIP related stuff." Roberts and the other individual opened the vehicle's front doors, which were open as Deputy Whaley approached the vehicle.

---

[1] Roberts's briefing characterizes, without citation, the Fairgrounds and the adjoining parking lot as "private" land, but this description does not have support in the record. Deputy Whaley testified the Fairgrounds parking lot is "a public parking lot" and Roberts neither challenged that testimony nor produced evidence demonstrating otherwise. Based upon the record, our analysis assumes that the Fairgrounds and parking lot are public property.

3

¶6 Deputy Whaley testified he was aware that Roberts was subject to court-ordered conditions for a suspended UPIS conviction.[2] Nearing the vehicle, Deputy Whaley radioed dispatch and requested the dispatcher read him the conditions set forth in Roberts's court order. One of the conditions required Roberts to "[s]ubmit to reasonable search of his/her person, vehicle, or place of residence." Deputy Whaley began speaking with Roberts while Roberts was standing outside the vehicle. Deputy Whaley reminded Roberts of the conditions and asked if he would consent to a search of the vehicle, but Roberts refused, stating the vehicle belonged to his mother. Deputy Whaley then shined his flashlight into the back window of the vehicle and saw a marijuana smoking device "poking out of a bag in the back seat." Deputy Whaley testified that he recognized the device as being used for smoking marijuana based upon "[his] training and experience."[3]

¶7 Deputy Whaley advised Roberts he was seizing the vehicle, but never said that Roberts could not leave. The District Court found that because "other individuals were making an effort to get into the vehicle," Deputy Whaley prevented their entry and stood in front of the driver's door to guard the vehicle and its contents. Deputy Whaley applied for and was granted a search warrant, and, while searching the vehicle, discovered

---

[2] The justice court entered an order convicting Roberts of two counts of UPIS on March 2, 2022, but suspended Roberts's sentence upon conditions. Deputy Whaley noted in his testimony that conditions for a suspended sentence may be imposed for up to six months. *See* § 46-18-201(2)(a), MCA.

[3] Deputy Whaley testified that he obtained his associate's degree in law enforcement and attended two law enforcement academies in addition to receiving training in Driving Under the Influence (DUI), Advanced Roadside Impaired Driving Enforcement (ARIDE), and other investigation techniques during his five years as a law enforcement officer.

marijuana, marijuana-related paraphernalia, and 25 alcoholic beverages. Roberts was charged with two counts of UPIS under § 45-5-624(1), MCA, one for alcohol and the other for marijuana.

¶8 Roberts pled guilty to both counts in justice court and was sentenced for UPIS (3rd offense) and UPIS (4th offense), with the sentences ordered to run concurrently. He appealed to the District Court and filed a motion to suppress evidence based on a lack of particularized suspicion, and a motion to dismiss one count for violation of double jeopardy. After receiving oral argument, the District Court issued separate orders denying both motions. The District Court denied the double jeopardy motion under what it described was a "straight forward statutory interpretation" of § 46-11-410(2), MCA. The District Court's order denying Roberts's motion to suppress evidence included findings of fact and conclusions of law. The District Court recognized that "[i]n this case, [Roberts] was subject to sentencing conditions" that required him to submit to a reasonable search and noted the "significant authority regarding the reasonableness of a search involving a probationer," but did not rule on that basis. Instead, the District Court denied the motion on application of the "plain view doctrine," citing *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535 (1983), and reasoning that "seizure of plainly viewed contraband within a vehicle is permissible under the Fourth Amendment to the U.S. Constitution." Here, said the District Court, "[t]he plain view doctrine allowed for the vehicle to be seized pending application for a warrant."

¶9 Roberts thereafter entered guilty pleas to the charges and reserved his right to appeal from the denial of motions. His sentences were stayed pending appeal.

## STANDARDS OF REVIEW

¶10 We review a district court's denial of a motion to suppress evidence "for clear error as to the findings of fact and de novo as to whether the district court correctly interpreted and applied the governing law." *State v. Yanbin Bao*, 2024 MT 308, ¶ 12, 419 Mont. 388, 560 P.3d 1207. Factual findings are clearly erroneous only if not supported by substantial credible evidence, if the lower court clearly misapprehended the effect of the evidence, or if a review of the record leaves this Court firmly convinced a mistake has been made. *In re Est. of M.A.C.*, 2025 MT 23, ¶ 15, 420 Mont. 259, 563 P.3d 284. "[A] defendant's motion to dismiss criminal charges on double jeopardy grounds is a question of law that we review for correctness." *City of Billings ex rel. Huertas v. Billings Mun. Ct.*, 2017 MT 261, ¶ 15, 389 Mont. 158, 404 P.3d 709.

## DISCUSSION

¶11 Roberts argues Deputy Whaley "was not lawfully at the vehicle," did not have particularized suspicion to seize him or search the vehicle because Roberts had earlier tested negative for alcohol and showed no signs of impairment, and conducted an illegal search because the contraband was not in plain view. Roberts also contends the District Court erred by denying his motion to dismiss the second UPIS charge for "double jeopardy" because the two offenses arose out of the same transaction under § 46-11-410, MCA. In response, the State argues Deputy Whaley's initial contact with Roberts did not

6

require particularized suspicion, and that the deputy's use of a flashlight at night did not violate the plain view doctrine. The State alternatively argues Deputy Whaley had particularized suspicion to conduct a brief investigatory stop based on the chaperone's earlier report about Roberts appearing to be intoxicated and his own prior encounters with Roberts. The State also argues that the two charges do not violate § 46-11-410, MCA, because they involve possession of different intoxicating substances. We do not reach all these arguments, but resolve the matter based upon the following analyses.

¶12    *1. Did the District Court err by denying Roberts's motion to suppress after determining that drug paraphernalia inside a vehicle he was using was found within plain view when illuminated at night by an officer's flashlight?*

¶13    A constitutional seizure "occurs when a government officer 'in some way' restrains a person's liberty 'by means of physical force' or a 'show of authority' that, under the totality of the circumstances, would cause an objectively reasonable person to feel not free to leave the presence of the government officer." *State v. Hoover*, 2017 MT 236, ¶ 15, 388 Mont. 533, 402 P.3d 1224 (quoting *State v. Clayton*, 2002 MT 67, ¶ 12, 309 Mont. 215, 45 P.3d 30). "Even a brief restraint of a person's liberty constitutes a seizure subject to the Fourth Amendment and Montana Constitution, Article II, section 11." *Hoover*, ¶ 15. A "search" is a means employed by the government in "gathering items of evidence or information which 'substantially infringes or intrudes into or upon one's home, person, or other area or thing in regard to which he or she has a reasonable expectation of privacy.'" *State v. Noli*, 2023 MT 84, ¶ 27, 412 Mont. 170, 529 P.3d 813 (quoting *State v. Zeimer*, 2022 MT 96, ¶ 24, 408 Mont. 433, 510 P.3d 100).

¶14 Searches and seizures by government agents, including law enforcement officers, are generally unlawful under the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution absent a judicial warrant properly issued upon a showing of probable cause of illegal activity and particularly describing the person, area, or item to be searched or seized. *State v. Loberg*, 2024 MT 188, ¶ 10, 418 Mont. 38, 554 P.3d 698 (citing U.S. Const. amend. IV ("no Warrants" for search and seizure "shall issue, but upon probable cause"); Mont. Const. art. II, § 11 ("[n]o warrant to search any place, or seize any person or thing shall issue . . . without probable cause"); *Noli*, ¶ 26). The underlying purpose of the Fourth Amendment and Article II, Section 11, is to "'protect the privacy and security of individuals' from unreasonable government intrusion or interference." *Hoover*, ¶ 14. It is not the function of these constitutional safeguards to "'eliminate all contact between the police and citizenry'" but, instead "'to prevent arbitrary and oppressive government interference with individual privacy and security.'" *State v. Davis*, 2024 MT 145, ¶ 17, 417 Mont. 188, 552 P.3d 33 (quoting *State v. Bailey*, 2021 MT 157, ¶ 20, 404 Mont. 384, 489 P.3d 889).

¶15 "A reasonably brief warrantless investigative stop, or *Terry* stop, is a recognized exception to the warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11, on particularized suspicion of criminal activity." *State v. Stanley*, 2024 MT 271, ¶ 24, 419 Mont. 61, 558 P.3d 1147 (citations omitted); *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

> Under this exception, a law enforcement officer may briefly stop and detain
> a person for investigative purposes without a warrant or probable cause for

8

an arrest if, based on specific and articulable facts known to the officer, including rational inferences therefrom based on the officer's training and experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity.

*Bailey*, ¶ 21 (quoting *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 11, 391 Mont. 457, 419 P.3d 1208 (citing §§ 46-5-401 and -403, MCA)). For purposes of a *Terry* stop, the "'particularized suspicion standard does not require that an officer be certain, or even ultimately correct,' that the subject is or is about to be involved in criminal activity." *Stanley*, ¶ 25 (citing *Hoover*, ¶ 18). The officer may instead base his particularized suspicion on "objective data and 'commonsense conclusions' and inferences from the perspective of 'those versed in the field of law enforcement,' that the person is or is about to be involved in criminal activity." *Stanley*, ¶ 25 (quoting *United States v. Cortez*, 449 U.S. 411, 418 and 421-22, 101 S. Ct. 690, 695, -97). "The question of whether particularized suspicion of wrongdoing exists is a factually driven inquiry dependent upon the totality of the circumstances giving rise to the investigative stop." *State v. Roberts*, 1999 MT 59, ¶ 13, 293 Mont. 476, 977 P.2d 974; *see also* § 46-5-401, MCA. *Terry* requires more than a mere hunch or good faith belief that the person is or is about to be engaged in criminal activity. *Stanley*, ¶ 25.

¶16 Roberts argues particularized suspicion was lacking based on Roberts's earlier negative alcohol PBT and the absence of any perceived signs of intoxication by Deputy Whaley, while the State points to the chaperone's expressed concern about Roberts being intoxicated, the fact that the PBTs could not detect other drugs, such as marijuana, and Deputy Whaley's past interactions with Roberts and the vehicle. However, we need not

decide this precise issue to resolve the appeal. Roberts also argues that "[t]he officer has to have particularized suspicion to even approach Mr. Roberts," and that merely speaking to Roberts about his prior sentencing conditions constituted an unconstitutional seizure.

¶17 In this regard, we have explained that "not all contacts between police officers and citizens are breaches of fundamental rights." *State v. McClellan*, 2024 MT 276, ¶ 13, 419 Mont. 132, 559 P.3d 816; *see State v. Rymal*, 2024 MT 277, ¶ 14, 419 Mont. 144, 559 P.3d 839 (implicit within the *Terry* standard "is that not every police-citizen encounter or interaction necessarily is or results in a constitutional 'seizure'"). Our cases illustrate a variety of fact-specific kinds of police-citizen encounters "held insufficient to rise to the level of a constitutional 'seizure' under the objective *Mendenhall/Terry*[4] standard, even when initiated by police with an acknowledged or clearly evident investigative motive." *Rymal*, ¶ 16. One case noted in *Rymal* was *State v. Questo*, 2019 MT 112, 395 Mont. 446, 443 P.3d 401, in which we held that no constitutional seizure occurred where a uniformed officer investigating a DUI-related criminal endangerment tip later located the suspect pumping gas at a store, parked his marked patrol car away from the pumps without top lights or siren, and walked over and began questioning him regarding the tip. While the officer questioned the man in detail regarding his prior whereabouts, passengers, the alcoholic odor about him, empty beer cans visible in his pickup bed, his assertion that he had not been drinking, and whether he would be willing to perform field sobriety tests, we noted the non-commanding and permissive manner in which the officer posed

---

[4] *United States v. Mendenhall*, 446 U.S. 544, 551-56, 100 S. Ct. 1870, 1875-78 (1980).

the questions, and that there was no objective record indication that he did anything suggesting or implying that the man was either required to answer those questions, or not otherwise free to disengage or leave. *Questo*, ¶¶ 15-18; *see also State v. Wilkins*, 2009 MT 99, ¶ 10, 350 Mont. 96, 205 P.3d 795 (an officer merely walking up to a person and putting a question to him "does not constitute a seizure"); *State v. Dupree*, 2015 MT 103, ¶ 12, 378 Mont. 499, 346 P.3d 1114 (holding law enforcement did not perform an unconstitutional stop after approaching and questioning a defendant who was "in a public area of her choosing when approached by the officers").

¶18 Deputy Whaley was present in the Fairgrounds parking lot pursuant to the event organizers' request that law enforcement help deter underage drug and alcohol usage at the event. After observing Roberts depart from the event by the back door, Deputy Whaley approached Roberts, advised Roberts of his awareness of Roberts's sentencing conditions, and requested Roberts's consent to a search of the vehicle pursuant to those conditions. Roberts declined. Deputy Whaley never stated that Roberts was under arrest, that he was not free to leave, or that he was required to allow Deputy Whaley to search the vehicle. He did not restrain Roberts by physical force. The District Court determined from the record that "[t]he Defendant was not detained." We agree that, under application of the case law discussed above, Roberts was not seized by Deputy Whaley's approach, and it did not require particularized suspicion to that point.

¶19 The District Court then based its denial of Roberts's motion to suppress on the "plain view doctrine," another exception to the warrant requirement. The plain view doctrine

permits officers, "'under certain circumstances, to seize evidence in plain view without a warrant.'" *State v. Lewis*, 2007 MT 295, ¶ 22, 340 Mont. 10, 171 P.3d 731 (quoting *State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996) (providing an overview of Montana case law regarding the plain view doctrine and adopting the U.S. Supreme Court's enunciation of the doctrine in *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301 (1990))). In accordance with federal precedent, we have outlined two conditions which must be satisfied to justify warrantless seizure under the plain view doctrine: "First, the item must be in plain view and its incriminating character be 'immediately apparent.' Second, not only must the officer be lawfully located in a place from which the object can be plainly seen but he or she must also have a lawful right of access to the object itself." *Loh*, 275 Mont. at 473, 914 P.2d at 600 (citing *Horton*, 496 U.S. at 136-37, 110 S. Ct. at 2307).

¶20 The plain view doctrine applies to law enforcement's seizure of plainly visible contraband from vehicles due, at least in part, to the doctrine's "interface with the *Carroll* doctrine's automobile exception to the search warrant requirement." *State v. Tenold*, 2020 MT 263, ¶¶ 9-10, 401 Mont. 532, 474 P.3d 839; *see Carroll v. United States*, 267 U.S. 132, 158-59, 45 S. Ct. 280, 283 (1925) ("The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law."). In *State v. Elison*, 2000 MT 288, ¶ 54, 302 Mont. 228, 14 P.3d 456, "this Court largely abandoned the automobile exception to search warrants under the Montana Constitution," however, "the *Elison* Court specifically reserved a limited number of instances in which

12

warrantless searches of vehicles would remain permissible, one of which was plain view." *Tenold*, ¶ 11; *see also State v. Logan*, 2002 MT 206, ¶ 14, 311 Mont. 239, 53 P.3d 1285 ("there is no 'automobile exception' to the search warrant requirement under the Montana Constitution . . . a warrantless search of an automobile requires probable cause and a generally applicable exception to the warrant requirement such as plain view search"). Thus, "when the sight of plainly visible contraband gives rise to probable cause with which to search a vehicle under the Fourth Amendment, the officer thereby gains a 'lawful right of access' to the interior of the vehicle and may then seize the item pursuant to the plain view doctrine." *Tenold*, ¶ 10.

¶21 The District Court determined the plain view doctrine applied because "[t]he Deputy was in a location where he was lawfully allowed to be, given his role attendant to the school dance," when "he shined his flashlight into the vehicle and saw a marijuana smoking device in plain view in the back seat of the vehicle," thus allowing "for the vehicle to be seized pending application for a warrant." Indeed, "[t]he essential predicate to any valid warrantless seizure of incriminating evidence is that the officer must be lawfully at the place from which he could plainly view the evidence. In other words, his initial entry onto . . . the place where he views the evidence must not" violate the Fourth Amendment or Article II, Section 11, of Montana's Constitution. *Loh*, 275 Mont. at 473, 914 P.2d at 600. Roberts argues Deputy Whaley "did not have a lawful reason to be at the vehicle." However, for the reasons discussed above, Deputy Whaley's initial entry onto and continued presence at the Fairgrounds, including the parking lot, was lawful. The District

Court did not err by determining Deputy Whaley had a right to approach Roberts and the vehicle in the parking lot.

¶22 The incriminating nature of a marijuana smoking device within the possession of, or in a vehicle driven by, an eighteen-year-old is apparent. *See* § 16-12-106, MCA (permitting personal use and cultivation of marijuana *only for Montana citizens aged 21 and older*). Roberts challenges whether the device was within Deputy Whaley's plain view, specifically, because he used a flashlight. This Court has explained how, under the Montana Constitution's enhanced privacy protections, certain advanced sensory technologies may erode an individual's reasonable expectation of privacy and rise to the level of a constitutional search. *See State v. Peoples*, ¶ 13, 2022 MT 4, 407 Mont. 84, 502 P.3d 129 (citing *State v. Goetz*, 2008 MT 296, ¶¶ 13-14, 35, 345 Mont. 421, 191 P.3d 489 (holding concealed electronic monitoring of face-to-face conversations in private settings are constitutional searches); *State v. Tackitt*, 2003 MT 81, ¶¶ 17-29, 315 Mont. 59, 67 P.3d 295 (holding drug dog-sniffs around vehicle exterior are constitutional searches); *State v. Siegal*, 281 Mont. 250, 265-78, 934 P.2d 176, 184-92 (1997) (holding thermal imaging of occupied structures is a constitutional search), *overruled on other grounds by State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556; *State v. Solis*, 214 Mont. 310, 314-20, 693 P.2d 518, 520-23 (1984) (plurality holding that undisclosed electronic monitoring of face-to-face conversations in private settings constitutes a search)). We have not held that a flashlight constitutes such enhanced sensory technology, and to do so would certainly restrict the capability of police to effectively operate in the dark hours of night.

The U.S. Supreme Court has held the use of a flashlight "trench[es] upon no right secured . . . by the Fourth Amendment" and "is not prohibited by the Constitution." *Brown*, 460 U.S. at 740, 103 S. Ct. at 1542. The State of Oregon reached the same conclusion on similar facts (*see State v. Faulkner*, 102 Ore. App. 417, 421, 794 P.2d 821, 823 (1990) ("use of [a] flashlight to see what was otherwise in plain view did not significantly impair [the] defendant's freedom from scrutiny and was, therefore, not a search")), as have others (*see Brown*, n.5 (collecting citations)). We conclude that Deputy Whaley's use of a flashlight to illuminate the back seat of a vehicle in the dark did not violate the plain view doctrine, or itself constitute a search in violation of the rights of privacy or search and seizure. Such a restriction upon the general use of a flashlight, which is the equivalent to an officer looking into a vehicle in broad daylight, would not be reasonable.

¶23 In evaluating the substantial evidence before it, the District Court determined Deputy Whaley was lawfully present at the Fairgrounds when assisting school dance organizers, and that the officer discovered incriminating drug paraphernalia under application of the plain view doctrine. That evidence provided Deputy Whaley a lawful right of access to the interior of Roberts's vehicle so he could seize the device. *See Tenold*, ¶ 10. Deputy Whaley thereafter had reasonable suspicion to seize the vehicle, preclude others from accessing the evidence, and obtain a valid search warrant for the vehicle. Therefore, the District Court did not err by denying Roberts's motion to suppress.

¶24    *2. Did Roberts's conviction of two counts of UPIS—one count for alcohol and the other for marijuana—violate the multiple conviction statute?*

¶25    While Roberts argues that, by way of the two charges, he "has been subject to double punishment, which is a violation of the right against double jeopardy," he cites only § 46-11-410, MCA, and does not make a constitutional double jeopardy argument, consistent with his argument before the District Court. *See State v. Burton*, 2017 MT 306, ¶ 20, 389 Mont. 499, 407 P.3d 280 (explaining that these statutes do not employ "terminology associated with constitutional double jeopardy jurisprudence" and that there are "important distinctions between the statutes and constitutional double jeopardy jurisprudence"). Section 46-11-410, MCA, prohibits convictions of multiple offenses under certain circumstances, and provides:

> (1) When the same transaction may establish the commission of more than one offense, a person charged with the conduct may be prosecuted for each offense.
> (2) A defendant may not, however be convicted of more than one offense if:
>   (a) one offense is included in the other;
>   (b) one offense consists only of a conspiracy or other form of preparation to commit the other;
>   (c) inconsistent findings of fact are required to establish the commission of the offenses;
>   (d) the offenses differ only in that one is defined to prohibit a specific instance of the conduct; or
>   (e) the offense is defined to prohibit a continuing course of conduct and the defendant's course of conduct was interrupted, unless the law provides that the specific periods of the conduct constitute separate offenses.

Montana law defines the phrase "same transaction" as "a series of acts or omissions that are motivated by: (a) a purpose to accomplish a criminal objective and that are necessary or incidental to the accomplishment of that objective; or (b) a common purpose or plan

16

[resulting] in the repeated commission of the same offense or effect upon the same person or the property of the same person." Section 46-1-202(24), MCA. An "intoxicating substance" is defined not within the UPIS statute itself, but instead is listed in § 45-2-101(32), MCA, as "a controlled substance, as defined in Title 50, chapter 32, *and* an alcoholic beverage, including but not limited to a beverage containing ½ of 1% or more of alcohol by volume." (Emphasis added.) Section 50-32-222(4)(x), MCA, lists marijuana as a controlled substance under Schedule I. *See* § 50-32-201, MCA, *Annotations*, Comm'rs Note (2023) ("All controlled substances are contained in either Schedule I, II, III, IV or V.").

¶26 Deputy Whaley recovered from the vehicle 25 alcoholic beverages and various forms of marijuana paraphernalia, as well as marijuana, resulting in two misdemeanor charges against Roberts under the UPIS statute, § 45-5-624, MCA. Roberts argues that the UPIS statute "does not differentiate between different substances" and, therefore, "[f]or facts alleged for a possible instant of possession of alcohol, multiple beers and a marijuana bong, there can only be one offense charged." In response, the State maintains the two misdemeanor charges against Roberts are appropriate, as they clearly fall within the "same transaction" rule and involve differing intoxicating substances. *See* § 46-11-410, MCA.

¶27 We agree with the District Court and the State's argument. Alcohol and marijuana are two separate and distinct intoxicating substances under state law. *Cp.* § 45-2-101(32), MCA *with* § 50-32-222(4)(x), MCA. Possession of either substance, alone, by an individual under 21 years of age results in the commission of a distinct crime under

17

§ 45-5-624, MCA. Likewise, simultaneous possession of both alcohol and marijuana by an underage individual results in the commission of two distinct crimes.[5] Roberts was not subject to "double punishment" for the same offense but, rather, punishment for two offenses uncovered within one transaction. Therefore, we conclude the District Court correctly dismissed Roberts's motion to dismiss for double jeopardy.

¶28 We affirm.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ KATHERINE M BIDEGARAY

---

[5] Roberts argues this holding would allow law enforcement to charge underage individuals with violating the UPIS statute on a per-item basis, meaning "a minor could potentially be charged with twelve counts if in possession of a twelve pack of beer," and presumably here, 25 counts for each separate beverage. However, this interpretation of § 45-5-624, MCA, is likely overbroad, as possession of multiple containers of alcohol would still constitute one intoxicating substance as defined by § 45-2-101(32), MCA.