FILED

02/03/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0486

DA 23-0486

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 12

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

RANDY JOE FISH,

     Defendant and Appellant.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-2022-277
Honorable Danni Coffman, District Judge

COUNSEL OF RECORD:

     For Appellant:

     James M. Siegman, Attorney at Law, Jackson, Mississippi

     For Appellee:

     Austin Knudsen, Montana Attorney General, Cori Losing, Assistant
Attorney General, Helena, Montana

     Travis Ahner, Flathead County Attorney, Kalispell, Montana

Submitted on Briefs:  January 30, 2026

Decided:  February 3, 2026

Filed:

                   _____
                            Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1 Randy Joe Fish was found guilty of Felony Criminal Possession of Dangerous Drugs. Fish now appeals the Eleventh Judicial District Court's denial of his motion to suppress the discovery of Methamphetamine in his pocket. We affirm.

¶2 We restate the issue on appeal as follows:

*Whether the District Court erred in denying Fish's motion to suppress.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 On May 26, 2022, at around 11:53 a.m., an employee of Windiggers Casino, located in Kalispell, Montana, contacted law enforcement to request a welfare check on two individuals who had been sleeping for several hours in a "red maroon colored" car parked outside the casino. In addition to the welfare check, the employee also requested law enforcement to tell the individuals to leave the parking lot.

¶4 Shortly after the call, Flathead County Sheriff's Deputies Patrick McGauley and Drew Kammerzell arrived at Windiggers Casino in uniform and in patrol cars without turning on sirens or lights. The deputies parked their patrol cars a short distance behind the car that matched the description given in the call and approached the vehicle. The deputies observed Christina Torres asleep in the driver's seat with Randy Joe Fish, the Appellant, asleep in the front passenger seat.

¶5 Deputy McGauley approached the driver side window and knocked while Deputy Kammerzell did the same on the passenger side. Torres, the owner and driver of the

vehicle, awoke and rolled down the window in response to Deputy McGauley's knocks as Deputy Kammerzell continued knocking, trying to wake Fish.

¶6 Once awake, Fish rolled down his window in response. Deputies McGauley and Kammerzell respectively inquired about how Torres and Fish were doing and what was going on. In response to Deputy Kammerzell, Fish explained they were trying to get some sleep and they were "good."

¶7 Immediately after, Deputy Kammerzell asked if Fish had an ID on him, to which he responded he had been gambling at Windiggers but did not have an ID on him. Within thirty seconds, Deputy Kammerzell requested Fish's name and date of birth. Fish responded by asking what time it was. Deputy Kammerzell again asked for Fish's name while Fish was turned away from him. Within several seconds, Fish replied "huh" and Deputy Kammerzell again asked for his name and date of birth. Fish voluntarily provided this information, and within a minute after Fish said he was "good" Deputy Kammerzell relayed his name and date of birth to dispatch.

¶8 After calling in the warrant check, Deputy Kammerzell asked Fish how long ago they were gambling in the Casino. Shortly thereafter, Deputy Kammerzell requested Dispatch to "confirm that"— presumably, the existence of the warrant.

¶9 While waiting to hear back from dispatch, Deputy Kammerzell attempted to explain why the deputies were present; however, Fish began to put his phone to his ear as if he were calling someone, so Deputy Kammerzell backed away. During this time, Torres and Fish remained in the vehicle, spoke with one another, and Fish used his phone and started to smoke a cigarette. Deputy McGauley then told Torres and Fish to "sit tight" and the two

3

officers walked behind the stopped vehicle. Less than ten minutes after Fish responded they were "good," the deputies moved to arrest Fish once the warrant was confirmed.

¶10    The deputies arrested Fish pursuant to a preexisting arrest warrant with a bail amount of $2,000. Deputy Kammerzell then searched Fish incident to the arrest and discovered a baggie which appeared to contain methamphetamine. Subsequent testing of the substance in the baggie revealed it contained less than 0.1 gram of methamphetamine.

¶11    The State of Montana charged Fish with Felony Criminal Possession of Dangerous Drugs in violation of § 45-9-102, MCA. Fish then filed a motion to suppress evidence of the methamphetamine seized subsequent to his arrest.[1] Fish asserted the deputies effectuated or prolonged a *Terry* stop without sufficient justification by asking for his name without a reasonable suspicion of illegal activity; therefore, any evidence obtained resulting from the stop should be excluded as fruit of the poisonous tree. *Terry v. Ohio*, 392 U.S. 1, 21, 30,  88 S. Ct 1868, 1880, 1884–85 (1968) (holding a police officer may stop and frisk an individual whom, "based on specific and articulable facts," he reasonably suspects is engaged in criminal activity and who may be armed and presently dangerous); *State v. Summers*, 2025 MT 109, ¶ 10, 422 Mont. 88, 569 P.3d 542 ("A *Terry* stop is a recognized exception that allows police to briefly stop and detain someone (without a warrant or probable cause for arrest) to investigate a reasonable particularized suspicion that a person is immediately involved in, or about to be involved in, criminal activity.")

---

[1] Along with Fish's motion to suppress the evidence, he also moved to suppress certain statements made to Deputy Kammerzell in the absence of warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). The State stipulated to suppressing these statements, so that issue is not before us on appeal.

(internal quotations omitted); § 46-5-401, MCA ("[A] peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.").

¶12 The State argued that asking for Fish's identification and name did not constitute an investigative stop or a seizure because a reasonable person would believe he was free to leave. In the alternative, the State argued if Fish was seized, Deputy Kammerzell had particularized suspicion to investigate the possible crime of trespass.

¶13 On December 9, 2022, the District Court held an evidentiary hearing on the suppression motions. At the hearing, Deputy Kammerzell testified, a video of the events was admitted into evidence, and the court reviewed his body camera footage. Deputy Kammerzell testified his interaction with Torres and Fish had two purposes: (1) to ensure the "occupants were okay," and (2) to "remove them from the property as requested." Deputy Kammerzell also testified he asked for Fish's identity to determine whether he had any active warrants as well as to investigate a criminal trespass.

¶14 Ultimately, after reviewing the briefs and hearing the evidence, the District Court denied Fish's motion to suppress, holding there was no *Terry* violation. The court reasoned:

> If I'm an officer and I'm called to or come upon a vehicle with two people at noon essentially sleeping in it, I'm naturally going to be wanting to make a bit of an inquiry, so I don't find that this was -- and in this case they had been specifically directed there by the property owners, or agents of the property owners, so I don't find that it was a Terry violation.

5

¶15 At trial, absent an objection by Fish, the District Court admitted into evidence the methamphetamine and a chemical analysis report, which reported the substance found on Fish was in fact methamphetamine. On May 5, 2023, the jury found Fish guilty of Criminal Possession of Dangerous Drugs. Fish now appeals the denial of his motion to suppress.

## STANDARD OF REVIEW

¶16 We review a district court's denial of a motion to suppress evidence in a criminal case to determine whether the findings of fact are clearly erroneous and whether the court correctly interpreted and applied the applicable law to the facts. *State v. Rymal*, 2024 MT 277, ¶ 9, 419 Mont. 144, 559 P.3d 839. A district court's findings of fact are clearly erroneous if they are not supported by substantial credible evidence, the court misapprehended the effect of the evidence, or we are convinced the court was mistaken upon our independent review of the record. *Rymal*, ¶ 9. Whether a district court correctly interpreted and applied the law to the facts is a question of law subject to de novo review. *Rymal*, ¶ 9.

## DISCUSSION

¶17 *Issue: Whether the District Court erred in denying Fish's motion to suppress.*

¶18 Fish contends the District Court abused its discretion in failing to suppress certain evidence on grounds that Deputy Kammerzell exceeded the scope of the community caretaker doctrine and thereby conducted an investigative stop without a particularized suspicion necessary to support it. The State counters Deputy Kammerzell's interaction with Fish was not a seizure in the first place. We review the issue of seizure first.

6

**Seizure**

¶19 Both the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution guarantee the right to be free from unreasonable searches and seizures. "The underlying purpose of the Fourth Amendment and Article II, Section 11, is to protect the privacy and security of individuals' from unreasonable government intrusion," it is not to prevent police from interacting with the citizenry. *State v. Roberts*, 2025 MT 110, ¶ 14, 422 Mont. 109, 569 P.3d 524 (internal quotations omitted).

¶20 As such, not just any interaction between a police officer and a citizen constitutes a seizure; "only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879 n.16. Moreover, one is only constitutionally seized by a law enforcement officer "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980); *State v. Case*, 2007 MT 161, ¶ 24, 338 Mont. 87, 162 P.3d 849. This "purely objective" test is "applicable to seizure issues raised under both the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution." *Case*, ¶ 24.

¶21 Our analysis is complicated by the fact that the District Court did not determine whether Fish was seized. The District Court's reasoning in denying the motion to suppress is perfunctory:

> If I'm an officer and I'm called to or come upon a vehicle with two people at noon essentially sleeping in it, I'm naturally going to be wanting to make a bit of an inquiry, so I don't find that this was -- and in this case they had been specifically

7

directed there by the property owners, or agents of the property owners, so I don't find that it was a *Terry* violation.

¶22 It is unclear from this reasoning whether the District Court found there was no seizure and therefore no violation of *Terry*, or there was a seizure, but the deputies had a reasonable suspicion of criminal activity and therefore they did not violate *Terry*. Because the question of seizure is a mixed question of facts and law, we conduct de novo review. *Rymal*, ¶ 15.

¶23 Fish argued in the District Court that he was unlawfully seized when Deputy Kammerzell requested his name, which ultimately led to the discovery of an arrest warrant. On appeal, Fish advances a more nuanced argument. He initially concedes "[t]he State correctly argues that the Appellant [Fish] was 'not seized' when Deputy Kammerzell first asked him to identify himself." He then argues that Deputy Kammerzell had no valid basis to even request his name, and he was subsequently and improperly seized. Fish argues the improper name request and unlawful seizure led to the discovery of the methamphetamine evidence, which we should suppress. Despite the apparent partial concession and modified argument on appeal, we determine we must first analyze the issue of seizure before addressing the basis to request Fish's name.

¶24 We have previously stated "a welfare check by its very nature necessarily involves a brief seizure—but a seizure nonetheless—in order for the officer to ascertain whether the citizen needs assistance or is in peril." *State v. Spaulding*, 2011 MT 204, ¶ 18, 361 Mont. 445, 259 P.3d 793; *see State v. Laster*, 2021 MT. 269, ¶ 16, 406 Mont. 60, 497 P.3d 224 ("While not every police-citizen encounter or contact rises to the level of constitutional

seizure of the citizen, community caretaker encounters or contacts by nature often do in order for the officer to ascertain or confirm whether the citizen is in fact in peril or otherwise in need of assistance." (internal quotations omitted)); *but see State v. Marcial*, 2013 MT 242, ¶ 14, 371 Mont. 348, 308 P.3d 69 ("A caretaker inquiry should not typically require a seizure."). *Spaulding* recognized, "[t]here may be fact-specific situations in which a welfare check does not involve a seizure." *Spaulding*, ¶ 19; *accord Laster*, ¶ 16 ("[W]hether a non-law enforcement community caretaker contact or encounter rises to the level of a constitutional seizure ultimately depends on the totality of the factual circumstances in each case.")

¶25 The line between constitutional seizures and coincidental or consensual police-citizen interactions is drawn where, under the totality of the circumstances, the "police conduct and posture would have caused an objectively 'reasonable person' to not feel free to ignore or refuse to answer or otherwise cooperate with the police, or disengage from any further interaction with them and move away." *Rymal*, ¶ 14 (citing *Mendenhall*, 446 U.S. at 551–55, 100 S. Ct. at 1875–77 (citations omitted)). It follows that even when a police-citizen interaction is initially consensual or coincidental, it may ripen into a seizure if that line is crossed. *Rymal*, ¶ 15.

¶26 Determining when the line has been crossed requires a fact-specific case-by-case analysis. As an aid to discerning whether a police-citizen interaction was initiated as a seizure or whether the line was crossed and the interaction ripened into a seizure, we look to the non-exhaustive list of circumstances set forth by the United States Supreme Court in *Mendenhall*. *State v. Ballinger*, 2016 MT 30, ¶ 18, 382 Mont. 193, 366 P.3d 668; *State v.*

*Wilkins*, 2009 MT 99, ¶ 9, 350 Mont. 96, 205 P.3d 795 (citing *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877). Those circumstances include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877. "In the absence of some such evidence [or similar evidence,] otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555, 100 S. Ct. at 1877.

¶27 In *Wilkins,* a uniformed officer in a marked patrol car approached Wilkins, who was in a running car parked on a remote street in an industrial area late at night and in the cold, and asked her why she was parked there. *Wilkins*, ¶¶ 2–3. We held there was no constitutional seizure because the officer engaged in a voluntary exchange with Wilkins, he did not initiate the stop of the vehicle, "[h]e did nothing to impede her liberty by means of physical force or show of authority—he did not have his emergency lights or sirens on, nor did he shine a spotlight into [Wilkins'] car." *Wilkins*, ¶ 14.

¶28 In *State v. Strom*, at 9:40 a.m., a uniformed police officer in a marked patrol car noticed a lone van in a park's parking lot with two occupants inside and without the van running. 2014 MT 234, ¶ 4, 376 Mont. 277, 333 P.3d 218. Finding the van suspicious given recent vandalism in the park, the officer parked his patrol car behind the van but left the van room to pull out and did not activate his emergency lights. *Strom*, ¶ 4. The Officer then approached the van, demanded IDs from the two individuals, told the occupants to wait and went back to the patrol car to check for driver status and warrants. *Strom*, ¶ 5.

Although *Strom* bears similarities to *Wilkins*, we held the officer seized the occupants because the van was in a public-use area in broad daylight and the officer's first communication with the occupants was a demand for identification. *Strom*, ¶ 13.

¶29 In *State v. Roberts*, a uniformed officer in a marked patrol car pulled into a one-lane driveway behind a truck—blocking its exit—after receiving a report that Roberts, the driver, was intoxicated while driving. 1999 MT 59, ¶¶ 4–7, 293 Mont. 476, 977 P.2d 974. The officer approached Roberts, who simultaneously exited the vehicle. *Roberts*, ¶ 7. The officer administered field sobriety tests after noticing Roberts smelled of alcohol and had trouble standing. *Roberts*, ¶¶ 7–8. Given the above facts, we held the officer seized Roberts. *Roberts*, ¶ 16.

¶30 Here, the *Mendenhall* factors indicate it is a close call whether Fish was seized. Although there were two deputies at the scene, each spoke with a different individual in a cordial and nonconfrontational manner. Although the deputies were in uniform, they did not display their weapons to Fish or Torres, nor did they physically touch Fish or Torres until Fish was placed under arrest. Additionally, although Deputy Kammerzell asked for Fish's name three times, it did not appear Fish registered the request the first time and after the second name request, Fish replied "huh." Deputy Kammerzell's third request was merely in response to Fish's question. The officer also backed away from Fish while he was on a phone call, indicating an intention to give Fish room and privacy to speak on the phone with an unknown person.

¶31 Like in *Wilkins*, the Deputies here did not initiate the stop of Torres' car, nor did they have their lights or sirens activated upon approaching. Unlike in *Strom*, the officers

11

did not immediately demand identification upon contacting Fish and Torres. However, the facts of *Roberts* cause hesitation in one regard. Here, Torres' car was parked facing a fence, the deputies parked their patrol cars a short distance behind Torres' car, and each officer stood on either side of the car. The State argued the officers parked far enough behind Torres that she had room to back her car out of the parking space and depart if she wanted to. The District Court did not make a finding of fact on that issue, and it is unclear from the video of the stop whether Torres and Fish had any available egress. Therefore, in the interest of preserving Fish's constitutional rights, we presume he was seized and we analyze whether the officers' interactions and questions were permissible as exceptions to the prohibition on warrantless seizures.

**Community Caretaker Doctrine**

¶32 Although we presume Fish was seized, a seizure is not unconstitutional if the officer was acting pursuant to one of the specified seizure exceptions. *Laster*, ¶ 11 ("Warrantless searches and seizures are *per se* unreasonable except under certain narrowly delineated exceptions." (citations omitted)). The two seizure exceptions relevant here are the welfare check and the investigatory stop. *Laster*, ¶ 11 (citations omitted).

¶33 Here, Fish argues Deputy Kammerzell exceeded the scope of the welfare check and lacked particularized suspicion to support an investigatory stop. We disagree. Deputies Kammerzell and McGauley initially approached the vehicle containing Fish and Torres to both conduct a welfare check pursuant to the community caretaker doctrine as well as to tell the individuals to leave the property. Indeed, during a welfare check, there is no requirement law enforcement's subjective reason for the interaction be based on the

12

community caretaker doctrine alone. *Spaulding*, ¶ 24. Rather, welfare checks are permissible wherever the officer initiates contact with a citizen "to investigate a potential vehicle accident or otherwise to ensure the safety of citizens." *State v. McClellan*, 2024 MT 276, ¶ 14, 419 Mont. 132, 559 P.3d 816 (quoting *Spaulding*, ¶ 18).

¶34 In analyzing the propriety of a particular welfare check, we utilize the following test:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure which must be justified by something other than the community caretaker doctrine, such as particularized suspicion or probable cause.

*McClellan*, ¶ 14 (quoting *Spaulding*, ¶ 21).[2]

¶35 Concerning the propriety of the welfare check, there is no dispute Deputies Kammerzell and McGauley's initial engagement with Fish and Torres was properly conducted pursuant to the community caretaker exception. The community caretaker doctrine places "an affirmative duty o[n] peace officers" to respond to calls for help. *City of Missoula v. Metz*, 2019 MT 264, ¶ 16, 397 Mont. 467, 451 P.3d 530 (quoting *State v. Grmoljez*, 2019 MT 82, ¶ 12, 395 Mont. 279, 438 P.3d 802).

---

[2] Notably, the United States Supreme Court recently issued their decision in *Case v. Montana*, which clarified the proper standard for welfare checks during household emergencies. 607 U.S. ___, ___ S. Ct. ___ (2026). This standard requires the officer to have "'an objectively reasonable basis for believing' that an occupant is seriously injured or imminently threatened with such harm" before entering the home to conduct a welfare check. *Case*, 607 U.S. at ___, ___ S. Ct. at ___. However, as this case does not involve a home entry we continue to utilize the above standard.

13

¶36 Under the first prong of the community caretaker test, Deputy Kammerzell had a duty to answer the caller's request that he stop and investigate. The deputies were informed by dispatch that a Windiggers employee was requesting a welfare check on the couple and wanted them to leave the premises. Additionally, Fish and Torres were asleep for several hours in a vehicle parked outside a casino at noon on a weekday. Based on the employee's concern for the couple's safety and the abnormality of their actions—given the time and place of their slumber—the "objective, specific and articulable facts" sufficiently supported the deputies' suspicion a welfare check was in order.

¶37 Fish argues once the deputies became aware the couple was okay, the grounds for continuing the welfare check ended. Indeed, once law enforcement becomes aware the citizen does not need assistance, "then any actions beyond that constitute a seizure which must be justified by something other than the community caretaker doctrine." *McClellan*, ¶ 14 (quoting *Spaulding*, ¶ 21). As such, once the deputies were able to rouse Fish and Torres from sleep, and were informed they were "good," the grounds supporting the community caretaker exception ended.

**Investigative Stop**

¶38 The State contends something other than the community caretaker doctrine did in fact justify the continued seizure, namely, particularized suspicion to conduct an investigative stop for the offense of trespass. We agree. "An officer who contacts a person in a community caretaking capacity is not required to immediately terminate the interaction . . . upon finding a person to appear well." *State v. Cleveland*, 2024 MT 214, ¶ 18, 418 Mont. 147, 556 P.3d 945. Rather, "[i]f, during the course of a community

14

caretaker interaction, the officer develops sufficient particularized suspicion of criminal activity, the officer may continue to ask questions to dispel or confirm those suspicions." *Cleveland*, ¶ 19.

¶39 Fish argues that due to the lack of a "no trespassing" sign on the property and because Deputy Kammerzell did not have knowledge of whether Fish was previously requested to leave, he lacked a particularized suspicion to investigate criminal trespass. We disagree. Such information would instead constitute probable cause Fish committed a criminal trespass.

¶40 The distinction between particularized suspicion and probable cause is an important one. Fish neglects this distinction and muddies the waters by arguing evidence sufficient to constitute probable cause is necessary to constitute particularized suspicion. However, these are two very different standards. An officer does not need probable cause that a trespass has been committed to conduct an investigative stop; rather, an officer needs particularized suspicion. *State v. Hunt*, 2025 MT 122, ¶ 24, 422 Mont. 322, 570 P.3d 576.

¶41 The threshold for particularized suspicion is lower than probable cause. *State v. Van Kirk*, 2001 MT 184, ¶ 14, 306 Mont. 215, 32 P.3d 735 (particularized suspicion "is quantitatively different and less stringent than probable cause to arrest or conduct a search."); *see State v. Carter-Brueggeman*, 2025 MT 193, ¶ 41, 423 Mont. 514, 574 P.3d 906 (explaining the officer's information was sufficient to create a particularized suspicion, but without more information it "never ripened into probable cause"). The question is one of degree. On one hand, "[p]robable cause exists if the facts and circumstances within the officer's personal knowledge . . . *are sufficient to warrant a reasonable person to believe*

15

the target of the seizure is committing or has committed an offense." *Carter-Brueggeman*, ¶ 40 (emphasis added) (quotations omitted). On the other, to show particularized suspicion, the state need only show "objective data from which an experienced officer can make *certain inferences and a resulting suspicion* that the occupant of the vehicle is or has been engaged in wrongdoing." *Hunt*, ¶ 25 (emphasis added) (quotations omitted).

¶42 Categorically, knowledge that Fish was previously requested to leave Windiggers' premises or that he purposely ignored a "no trespassing" sign far exceeds data necessary for an officer to make *inferences and a resulting suspicion* of criminal trespass. Such would be equivalent to the officer possessing knowledge that all elements of criminal trespass were met.

¶43 The elements of criminal trespass are: (1) knowingly (2) entering or remaining unlawfully (3) upon the premises of another. Section 45-6-203(1), MCA ("[A] person commits the offense of criminal trespass to property if the person knowingly . . . enters or remains unlawfully in or upon the premises of another.") Moreover, "[a] person enters or remains unlawfully in or upon . . . [a] premises when the person is not licensed, invited, or otherwise privileged to do so." Section 45-6-201(1), MCA. If invited, "[t]he privilege may be revoked at any time by personal communication of notice by the landowner or other authorized person to the entering person." Section 45-6-201(1), MCA.

¶44 Deputy Kammerzell encountered Fish on Windiggers' property. If Deputy Kammerzell knew Windiggers had informed Fish that his privilege to remain on the premises was revoked and Fish remained anyway, Deputy Kammerzell would have knowledge that Fish (1) knowingly (2) remained unlawfully (3) on the premises. In other

16

words, Deputy Kammerzell would have knowledge that all the elements of criminal trespass were met. This degree of knowledge, while sufficient for probable cause is not necessary to show a particularized suspicion.

¶45 Particularized suspicion only requires objective data supporting an experienced officer's inferences and a resulting suspicion of criminal activity. *Hunt*, ¶ 25. Whether a particularized suspicion exists "'is a factually driven inquiry dependent upon the totality of circumstances.'" *McClellan*, ¶ 15 (quoting *State v. Graham*, 2007 MT 358, ¶ 15, 340 Mont. 366, 175 P.3d 885). However, "the related question of whether the circumstances indicated activity that was illegal is a question of law." *State v. Wilson*, 2018 MT 268, ¶ 28, 393 Mont. 238, 430 P.3d 77. Particularized suspicion is more than a mere hunch; rather, it must be supported by "specific articulable information, considering the quantity, substance, quality, and degree of reliability of information known to the officer at the time." *Hunt*, ¶ 25 (internal quotation omitted). This standard is likewise codified in Montana law at § 46-5-401, MCA, which also allows an officer performing an investigatory stop to "request the person's name and present address." Section 46-5-401(2)(a), MCA.

¶46 Here, Deputy Kammerzell was aware (1) Fish and Torres were asleep in a car for several hours, and he was called there to (2) conduct a welfare check and (3) request Fish to leave. The third request indicates Fish was no longer welcome on the premises and his privilege to remain there was revoked. Given this information, Deputy Kammerzell knew two of the three elements of criminal trespass were met. However, further investigation was necessary to determine whether Fish had knowledge he was trespassing. Therefore,

17

Deputy Kammerzell's "inferences and resulting suspicion" that Fish may have been trespassing were reasonable.

¶47     The Dissent criticizes this analysis on the grounds that we are relying on the officer's "after-the-fact description" and the State's "after-the-fact assertions" that Deputy Kammerzell was investigating a possible trespass, in addition to the welfare check and notifying Fish he needed to leave the property. Dissent, ¶ 92. All suppression hearings and arguments are necessarily after-the-fact, there is no way around that temporal reality. It is worth reiterating the officer's consistent testimony was that he had not detained Fish and Fish was free to leave. Deputy Kammerzell's testimony regarding possibly detaining Fish to investigate trespass came in response to a hypothetical posed to him by defense counsel: "I understand it's [the] prosector's position and you're giving testimony that . . . there was not actually a stop that occurred, that the Defendant was free to leave. . . . But *if this was a situation where he didn't feel free to leave. . . .*" (emphasis added). In response to what other investigation he may have been conducting, the Deputy stated he was also investigating to see whether Fish had been previously evicted but had returned. The officer did not change the justification or testimony on detention or why he was there, he responded to the Defendant's skillful cross-examination.

¶48     In analyzing the testimony and the law, we have not created a reverse constitutional holding, as the Dissent suggests, where an officer can seize first and develop particularized suspicion later. Dissent, ¶ 91. We have held the officer had particularized suspicion and could have detained Fish—without actually determining that he did so—to investigate for trespass. Investigative stops tend to culminate in one of two ways: the officer releases the

18

person upon dispelling the suspicion and failing to establish probable cause, *see, e.g.*, *Carter-Brueggeman*, ¶ 41 ("Here, Deputy Hsu extended the traffic stop due to particularized suspicion of drug activity, but this suspicion was dispelled by the end of the questioning. His suspicion never ripened into probable cause."), or they find probable cause and arrest or cite the person for criminal activity. This means if the circumstances justify it, an officer can have particularized suspicion of criminal trespass even if he is unaware whether the suspect has knowledge they are trespassing. Our holding in *State v. Carlson*, 2000 MT 320, 302 Mont. 508, 15 P.3d 893 reveals as much.

¶49 In *Carlson*, a deputy responded to a call concerning a homeowner's request to have a vehicle moved, which was parked on his property. *Carlson*, ¶¶ 4–8. Before the call, the homeowner had no contact with Carlson, who was inside the car, because the doors were locked and the windows were covered. *Carlson*, ¶ 4. Once the deputy arrived the property owner informed him of the situation and the vehicle's license plate number. *Carlson*, ¶ 5. The deputy then relayed the license plate number to dispatch and was called back to the sheriff's office. *Carlson*, ¶ 5. Once there, the deputy was informed the vehicle belonged to Carlson and that she was under investigation for illegal drug activity. *Carlson*, ¶ 5. When the deputy went back to investigate the vehicle, he spoke with the property owner's neighbor with whom the property owner was in an ongoing dispute over the property in question. *Carlson*, ¶¶ 4, 7. The neighbor informed the deputy the vehicle belonged to Carlson, a friend of the neighbor. *Carlson*, ¶ 7. Upon approaching the vehicle, the deputy found Carlson inside and requested her to come out for questioning. *Carlson*, ¶ 8. After Carlson exited the vehicle, the deputy detained her for approximately half an hour until

19

more law enforcement arrived with a drug sniffing dog to inspect the vehicle. *Carlson*, ¶¶ 8–10.

¶50 On appeal, we held the deputy lacked particularized suspicion concerning the illegal possession of drugs to continue detaining Carlson. *Carlson*, ¶ 27. However, although Carlson was parked on land subject to a property dispute and the property owner never informed Carlson she was trespassing, we also held the deputy *did* have particularized suspicion to conduct an investigatory stop for criminal trespass based on the property owner's request to have the vehicle removed. *Carlson*, ¶¶ 20–21, 23 ("The officers had a particularized suspicion that allowed them to investigate the presence of Carlson's van on Bahm's property. However, that particularized suspicion was limited to accomplishing the narrow purpose of the trespass investigation.").

¶51 That said, "[t]he duration and scope of an investigative stop must be carefully limited to its underlying 'justification,' and thus may not exceed what is reasonably necessary to confirm or dispel the predicate suspicion for the stop." *Laster*, ¶ 13 (citations omitted). Deputy Kammerzell testified his justifications for prolonging the stop included both (1) to ascertain whether Fish and Torres had already been asked to leave Windiggers and (2) to document their identities in case they returned after the Deputies asked them to leave. Without knowing Fish's identity, Deputy Kammerzell could not investigate criminal trespass nor could he document their notice to leave if Fish and Torres came back. As such, Deputy Kammerzell's name request was justified by the purpose of his investigation as well as by Montana's investigatory stop statute. Section 46-5-401(2), MCA ("A peace

20

officer who has lawfully stopped a person or vehicle under this section may: (a) request the person's name and present address.").

¶52 Once Deputy Kammerzell obtained Fish's name and date of birth, he relayed this information to dispatch, which advised that Fish had an active warrant. As a result, Deputy Kammerzell's knowledge of the warrant provided him with further particularized suspicion to prolong the stop until dispatch confirmed the warrant's existence. Several minutes later, once dispatch confirmed the warrant, Deputy Kammerzell developed probable cause to arrest Fish and conduct a search incident to the arrest.

¶53 The Dissent criticizes this reasoning on the grounds that Deputy Kammerzell had no reason to believe Fish had been previously notified his invitee status had been revoked and therefore had no basis to investigate Fish for trespass. Dissent, ¶¶ 84, 85, 89. As explained above, if Deputy Kammerzell had knowledge that Fish had been previously informed he was not allowed on the property, that would have given Deputy Kammerzell probable cause to cite or arrest Fish for trespass. But Deputy Kammerzell still had a reasonable basis to check Fish's identity for the investigative purposes to which he testified. And lest we forget, Deputy Kammerzell was also delivering the notification (while checking if this was Fish's first notice) that Fish was no longer allowed on the property. As he testified, providing such notice includes documenting the identity of the person receiving the message to depart, so law enforcement can have a record of that notice in the event Fish later returns to the property.

¶54 At no point during his interaction with Fish did Deputy Kammerzell breach the Fourth Amendment's or Article II, Section 11's prohibition on unreasonable searches and

21

seizures. Deputy Kammerzell approached Fish as a community caretaker with particularized suspicion to investigate a possible criminal trespass. Furthermore, the circumstances necessitated that Deputy Kammerzell document Fish's identity to check whether he had been previously evicted, and to document the notice in case Fish came back to Windiggers after his privilege to be on the premises was revoked. Once dispatch informed Deputy Kammerzell of the warrant, further particularized suspicion arose justifying the prolonged seizure of Fish until dispatch was able to confirm its existence.

## CONCLUSION

¶55 The District Court's determination Deputy Kammerzell did not commit a *Terry* violation in prolonging Fish's seizure until dispatch confirmed his warrant is therefore not clearly erroneous because it is based on substantial credible evidence. Moreover, upon de novo review of the record, the District Court correctly interpreted the law and properly applied it to the facts of this case.

¶56 Affirmed.

/S/ CORY J. SWANSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

Justice Katherine M. Bidegaray, dissenting.

¶57 Fish moved to suppress methamphetamine discovered in his pocket after Flathead County deputies approached a parked vehicle in which he was a passenger to perform a

22

welfare check. The Eleventh Judicial District Court denied the motion. The majority affirms, holding that the deputies possessed particularized suspicion to investigate trespass under §§ 45-6-201 and -203, MCA. This conclusion rests on misapplication of law and an incomplete view of the record. For the following reasons, I respectfully dissent.

## I. Legal Framework

¶58 The Fourth Amendment and Article II, Section 11, of the Montana Constitution protect individuals from unreasonable searches and seizures. Warrantless government searches and seizures are per se unreasonable except under narrowly-delineated exceptions. *State v. Rymal*, 2024 MT 277, ¶ 12, 419 Mont. 144, 559 P.3d 839. The State has the burden to show a challenged search or seizure was constitutional. *State v. Noli*, 2023 MT 84, ¶ 29, 412 Mont. 170, 529 P.3d 813.

¶59 The threshold requirement for Fourth Amendment and Article II, Section 11 protections is that a seizure occurred. *Rymal*, ¶ 13; *State v. Strom*, 2014 MT 234, ¶ 10, 376 Mont. 277, 333 Mont. 218. "A constitutional seizure of a person occurs when a government officer in some way restrains a person's liberty by means of physical force or a show of authority that, under the totality of the circumstances, would cause an objectively reasonable person to feel not free to leave the presence of the government officer." *State v. Hoover*, 2017 MT 236, ¶ 15, 388 Mont. 533, 402 P.3d 1224 (citing *United States v. Mendenhall*, 446 U.S. 544, 551-55, 100 S. Ct. 1870, 1875-77 (1980), and *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968)); *accord Rymal*, ¶ 14 (a seizure occurs when police "conduct and posture would cause an objectively reasonable person to not feel free to ignore or refuse to answer or otherwise cooperate with the police, or disengage from any

further interaction with them and move away"). Even a brief restraint of a person's liberty constitutes a seizure. *State v. Laster*, 2021 MT 269, ¶ 12, 406 Mont. 60, 497 P.3d 224. Always, the seizure analysis—including whether a seizure occurred and whether it was justified—is a fact-driven inquiry based on the totality of circumstances. *Strom*, ¶ 10; *State v. Zeimer*, 2022 MT 96, ¶ 27, 408 Mont. 433, 510 P.3d 100; *State v. Reynolds*, 272 Mont. 46, 50, 899 P.2d 540, 542-43 (1995).

¶60  Montana's community caretaker doctrine is a recognized warrant exception allowing law enforcement to approach a citizen to render aid when objective facts indicate peril, but the warrant exception terminates once the officer is assured that the citizen is not in peril or is no longer in need of assistance. *State v. Spaulding*, 2011 MT 204, ¶¶ 18, 21, 361 Mont. 445, 259 P.3d 793. A welfare check will often, by its nature, involve a brief seizure to ascertain whether an individual is in danger or needs help. *Spaulding*, ¶ 18; *Laster*, ¶ 16. *See also State v. Marcial*, 2013 MT 242, ¶¶ 13-15, 371 Mont. 348, 308 P.3d 69 (given its non-investigative purpose, "a caretaker inquiry should not typically require a seizure" in the constitutional sense). Unlike an investigative stop, a welfare check is unrelated to the enforcement or prosecution of the criminal law. *Laster*, ¶¶ 15-17; *Spaulding*, ¶ 18.[1]  The scope of a welfare check, then, is limited to its purpose—determining whether citizens need help and providing it. *Marcial*, ¶ 15. It may ripen into an investigative stop only if particularized suspicion of criminal activity arises *prior* to

---

[1] *Accord Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973) ("community caretaking functions [are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute").

resolution of the peril. *See State v. Lovegren*, 2002 MT 153, ¶¶ 22-26, 310 Mont. 358, 51 P.3d 471; *Laster*, ¶ 18.[2] In other words, once the purpose of a welfare check is resolved, any further detention by law enforcement must be constitutionally justified. *Spaulding*, ¶¶ 21, 24; *Marcial*, ¶ 15; *Laster*, ¶ 18. *See also State v. Case*, 2024 MT 165, ¶¶ 25-26, 31, 37, 417 Mont. 354, 553 P.3d 985 (if, after the welfare check was resolved, officers took "any actions beyond *which would constitute a seizure*, . . . the analysis must morph from the community caretaker doctrine to" a constitutional seizure analysis (citing *Lovegren*) (emphasis added; punctuation omitted)); *State v. Nelson*, 2004 MT 13, ¶ 6, 319 Mont. 250, 84 P.3d 25 (citing *Lovegren*); *Lovegren*, ¶¶ 24-25 (citing *Terry* investigative stop standard for when a constitutional seizure occurs).

¶61    A temporary investigative stop, or *Terry* stop, is another recognized exception to the warrant requirement. An officer may briefly stop and detain an individual for investigative purposes, but only upon reasonable particularized suspicion that the individual "is immediately involved in, or about to be involved in, criminal activity." *Rymal*, ¶ 12; *Hoover*, ¶ 17. Relevant considerations include the quantity, substance, quality, and degree of reliability of the information known to the officer at the time of the stop. *Laster*, ¶ 12; *Zeimer*, ¶ 28 (what the officer knew or didn't know "in hindsight" is irrelevant). While it does not require the officer to be certain or correct that the person is engaged in criminal activity, particularized suspicion requires more than "a mere generalized suspicion, possibility, undeveloped hunch, or good faith belief." *Laster*, ¶ 12;

---

[2] *Accord State v. Cleveland*, 2024 MT 214, ¶¶ 18-19, 23, 418 Mont. 147, 556 P.3d 945.

*Hoover*, ¶¶ 18, 28. Further, "perfectly legal or innocuous" behavior is insufficient alone to support particularized suspicion of criminal activity. *Noli*, ¶ 32; *State v. Hunt*, 2025 MT 122, ¶ 26, 422 Mont. 322, 570 P.3d 567 (behavior insufficient to support particularized suspicion may include "inconsistent statements concerning a person's conduct, presence, or plans" or "unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police").

¶62 This Court recognizes that requests for identity are generally reasonably related to the purpose of a lawful investigative stop. *State v. Stanley*, 2024 MT 271, ¶¶ 24, 27, 419 Mont. 61, 558 P.3d 1147; *Noli*, ¶ 34 (officer inquiry incident to a lawful stop must be "reasonably related in scope to the particularized suspicion and purpose that justified the stop" in the first instance). Once an individual is lawfully detained based on particularized suspicion of criminal wrongdoing, § 46-5-401(1) and (2)(a), MCA, authorize law enforcement to request the individual's name. *Stanley*, ¶ 28 (§ 46-5-401 is a "codification" of the *Terry* investigative stop particularized suspicion standard). Absent such a lawful investigative stop, Montanans have *no* obligation to identify themselves to law enforcement.

## II. Totality of Factual Circumstances Here

¶63 The facts are straightforward and undisputed. On May 26, 2022, an employee of Windiggers Casino in Kalispell called dispatch at 11:53 a.m. to request a welfare check on two individuals who had been sleeping for several hours in a maroon car parked in the casino's parking lot. The caller asked that law enforcement check on their welfare and

26

have them leave the property. The employee did not report any criminal activity or trespass; the employee simply wanted the occupants moved along.

¶64 Deputies Patrick McGauley and Drew Kammerzell responded to the call in separate patrol vehicles. Deputy Kammerzell's body camera footage of the entire encounter was admitted into evidence at the suppression hearing.[3] When the deputies arrived at the Windiggers parking lot, the vehicle in question was legally parked, engine off, at the back of the casino in a parking space and facing a chain link fence. McGauley parked his K-9 patrol vehicle about one car-length directly behind the vehicle, and Kammerzell parked diagonally about two car-lengths away facing the passenger side. Neither deputy activated his patrol vehicle top lights. Both uniformed deputies approached—McGauley on the driver's side, Kammerzell on the passenger's—and simultaneously flanked the vehicle. Torres, the driver, and Fish, the passenger, apparently had been sleeping, but stirred when the deputies each knocked on the car windows.

¶65 Torres rolled down her window and engaged with McGauley briefly. Torres is inaudible on the body cam, but McGauley can be heard asking her, "how you doin'?" and "whatcha up to?" He asked again, "what are you up to?" and then asked, "do you have your ID for me really quick," "who is the vehicle registered to," and "what is your name and date of birth, ma'am?" While McGauley questioned Torres, Kammerzell knocked on the passenger window a second time. Fish rolled down the window a few inches. Kammerzell asked, "what's going on?" Fish answered, "just getting a little sleep, a nap.

_____

[3] The body cam video is with the record on appeal and the State, in its briefing, directs this Court to 0:04-12:31, 12:42-13:35, and 14:20-32.

27

It's all good." Kammerzell asked, "are you guys good here?" Fish answered, "yeh, we're good."

¶66 Immediately after, Deputy Kammerzell asked Fish, "you got ID on you, man?" Fish answered "actually, I don't. We were just gambling a little bit." Kammerzell then paused his questioning, and McGauley can be heard questioning Torres. He asked her, "who's the vehicle registered to?"; "what is your name again?"; "do you have anything identifying you at all?"; "what's your name?"; "how do you spell that?"; "how do you spell your last name?"; and "date of birth?" Then, about 2:30 into the encounter, McGauley told Torres to "sit tight for me" as he stepped toward the rear of the vehicle. During this exchange between McGauley and Torres, Fish was facing Torres, obviously listening. Immediately after McGauley told Torres to "sit tight," Kammerzell, pen and pad in hand, asked Fish, "what's your first name, sir?" Instead of answering, Fish, apparently distracted,[4] asked what time it was. Kammerzell answered it was "about 12:10 . . . just after noon." Kammerzell then asked Fish twice more for his name. Fish finally answered and also provided his date of birth when asked.

¶67 Kammerzell then immediately called in to dispatch for a warrants check.[5] Dispatch advised of an MHP warrant. While waiting for MHP confirmation, Kammerzell asked Fish how long ago they were gambling. Fish answered about 9 a.m. About 4:30 into the

_____

[4] When later asked at trial if Fish was "avoiding" his questions, Deputy Kammerzell testified that Fish "seemed like he was distracted when I was asking him some questions."

[5] Kammerzell called Flathead County dispatch for a "29 check, Montana male" and then gave Fish's first and last name and date of birth.

28

encounter, Kammerzell told Fish that "the only reason we're out here with you guys is we got a call from employees that you guys have been parked here sleeping for a while." Over the entire encounter, this is the extent of discussion regarding Fish's and the deputies' presence at the casino.

¶68 While the deputies stood behind the car waiting for MHP to confirm the warrant, Kammerzell said the following to McGauley:

> Yeh, they're probably up to no good because [he] did the whole, you know—trying to figure out who he is—immediately lights up a cigarette. Then [he] starts trying to change questions, you know, try to change it around like, hey, do you know what time it is?—all before I got his name out of him. So, I mean, he knows he has a warrant, I bet.

Twelve minutes into the encounter, upon confirmation of the warrant,[6] Kammerzell arrested Fish and found a small bag containing methamphetamine during a search incident to arrest.

¶69 Prior to trial, Fish sought to suppress the drug evidence as the illegal fruit of an unconstitutional seizure. At the suppression hearing, Kammerzell said the purpose for contact, consistent with the Windiggers employee's report, was "to make sure that the occupants were okay, and then . . . to remove them from the property as requested." However, he was personally unaware whether anyone had contacted Torres or Fish prior to his arrival and he did not check with casino personnel or ask McGauley whether he had. Kammerzell admitted that asking for Fish's ID was unrelated to the welfare check. Instead, he said he asked for Fish's identity to (1) discover whether he had any warrants and

---

[6] Kammerzell later testified that dispatch confirmed the MHP warrant prior to his arresting Fish.

(2) ascertain whether he had previously been trespassed from the property that day. When asked what he would have done if Fish refused to provide his name, the deputy replied: "Told him to have a nice day and leave the private property." No witness testified—and the State did not argue—that the parking lot was posted "No Trespassing" or that casino staff had personally ordered the vehicle occupants off the property.

¶70 The State asserted that Fish was not seized. And if he was, the seizure was supported by particularized suspicion of trespassing. Despite the alternative arguments, the District Court concluded only that:

> If I'm an officer . . . called to or come upon a vehicle with two people at noon essentially sleeping in it, I'm naturally going to be wanting to make a bit of an inquiry, so I don't find that this was—and in this case they had been specifically directed there by . . . agents of the property owners, so I don't find that it was a *Terry* violation.

The court did not issue any subsequent written order. It is unclear from the record whether the court concluded that *no* seizure occurred or that a *legal* seizure occurred. Such an ambiguous ruling unnecessarily confuses party arguments on appeal.[7] Nevertheless, if the court denied suppression of the drug evidence because it concluded no seizure occurred, that conclusion was erroneous. Or, if the court denied suppression because it concluded a seizure occurred but particularized suspicion existed to justify the seizure, that conclusion was also erroneous. *See Stanley*, ¶¶ 21, 30; *State v. Kauffman*, 2002 MT 294, ¶¶ 9-12, 313 Mont. 1, 59 P.3d 1166 ("when legal conclusions arise in the mix of the totality of the

---

[7] For example, in arguing that no seizure occurred, the State asks us to affirm the District Court on a right-result/wrong-reason basis, contending that the court denied suppression "only based on whether Deputy Kammerzell had conducted an unlawful *Terry* stop."

circumstances and when the court applies the law to its findings, our review of those matters of law is plenary").

## III.  Arguments on Appeal

¶71    Here, Kammerzell's testimony established that he and McGauley had two purposes for contacting Fish and Torres:  a welfare check and to remove them from the casino property.  A dual purpose for detention is permissible, so long as both purposes are constitutionally justified.[8]  Fish does not dispute that the welfare check itself—deputies making initial contact to ascertain whether Torres and Fish were in danger or needed help—was lawful.[9]  Therefore, the only questions presented are (1) whether Fish was seized beyond resolution of the welfare check and, if so, (2) whether that seizure was constitutional.  Fish contends he was seized when Kammerzell asked him to identify himself because he was not free to ignore the deputy and leave.  And Fish contends that this seizure was unlawful because, at the time, Kammerzell had no particularized suspicion that Fish had been, was, or was about to be involved in criminal activity.

---

[8] A welfare check may not be the *only* purpose for a stop, but any articulated other purpose for officer contact must be supported by the evidence.  *Spaulding*, ¶ 24; *Laster*, ¶¶ 17, 21-24.

[9] Despite inartful appellate argument, Fish has always maintained that he was unconstitutionally seized when Kammerzell asked him *to identify himself* without any particularized suspicion of criminal activity.  His argument, by analogy to similar cases, is that the deputies unlawfully *expanded* the community caretaker stop into an unconstitutional seizure.  He does not contest that deputies had a lawful reason for initial contact and therefore the propriety of the welfare check—including whether Fish was seized for that purpose—is not at issue here.  Though, if we had to answer whether a community caretaker encounter constitutes a constitutional seizure, *Laster* states the test—it is the *Terry*/*Mendenhall* analysis.  *See Laster*, ¶ 16 (citing *Lovegren*, ¶ 24 (citing *Terry*)).

¶72     Relying on *Rymal*, the State maintains that Fish was not seized when Kammerzell asked for his ID and name; instead, the encounter was consensual until discovery of the warrant. Alternatively, if Fish was seized when asked to identify himself, the seizure was lawful because Kammerzell had particularized suspicion that Fish was trespassing. Alternatively, even if the seizure was unlawful, the existence of a valid arrest warrant was an intervening circumstance sufficient to attenuate the taint of the constitutional violation. The State, however, raises its attenuation argument for the first time on appeal and therefore I will not address it.[10]

## IV.  Fish Was Constitutionally Seized

¶73     The threshold question is whether Fish was constitutionally seized at the time Kammerzell asked him for identification; if he wasn't, his constitutional rights were not implicated. *Strom*, ¶ 10; *Rymal*, ¶ 13; *accord Case*, ¶ 37 (if the officer took any action beyond resolution of the welfare check, the analysis "morphs" from the community caretaker doctrine to a constitutional seizure analysis (citing *Lovegren* (citing *Terry*))). Again, Fish does not dispute that the welfare check was a lawful purpose for initial contact. Therefore, we may set aside the community caretaker issue and begin the seizure inquiry at the moment the welfare check was resolved—when Fish assured Kammerzell he was "good."  Immediately after, concededly *unrelated* to the welfare check, Kammerzell asked Fish for ID. The State insists that Fish was not seized at this time because a reasonable person in his shoes would feel free to disregard the question and leave. But the totality of

---

[10] *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, 67 P.3d 207.

circumstances show otherwise. Kammerzell asked Fish for ID (1) armed and in uniform; (2) while standing immediately outside the door of a car where Fish was the passenger, with McGauley, a second officer also armed and in uniform, standing immediately outside the driver's door engaging Torres in questioning; and (3) with his and McGauley's marked patrol vehicles parked immediately behind and to the side of Torres' car.

¶74 Fish answered he did not have ID on him. Kammerzell then paused his questioning while McGauley continued questioning Torres. McGauley can be heard on Kammerzell's body camera repeatedly asking Torres for her name and identification. Once Torres provided that information, McGauley instructed her to "*sit tight*." Fish, facing Torres at that time, unquestionably also heard the deputy's order. As soon as McGauley said, "sit tight," Kammerzell asked Fish for his name. Though he did not immediately answer, Fish eventually succumbed to Kammerzell's *third* request and also provided his date of birth when asked. This type of persistent, repetitive questioning is exactly the type of police questioning a person in Fish's position would feel compelled to answer.

¶75 The District Court focused on Kammerzell's tone during this interaction, noting it was "low key and not confrontive." While officer tone is informative, the seizure inquiry is a holistic endeavor, asking whether, under the totality of circumstances, a reasonable person in Fish's position would "feel free to ignore or refuse to answer or otherwise cooperate with the police, or disengage from any further interaction with them and move away." *Rymal*, ¶ 14; *Stanley*, ¶ 21. Kammerzell may have been "polite" but his questioning was anything but permissive or conversational. The only things he said to Fish before

33

asking whether he had ID were "what's going on?" and "are you good here?"—inquiries that pertained to the welfare check exclusively.

¶76 In *Rymal*, we held that Rymal's encounter with a single officer in an open parking lot was not a constitutional seizure due to its voluntary and consensual nature. The officer parked and approached Rymal in a manner that did not block or impede her ability to leave the scene and engaged her in "manifestly polite, cordial, permissive, and non-coercive conversation" prior to Rymal volunteering her name and social security number when asked if she had ID and then, non-sequitur, disclosing she had an active warrant. *Rymal*, ¶¶ 22-26, 29-30. Conversely, in *Stanley*, ¶ 23, we held that a pedestrian was constitutionally seized on a streetcorner where two officers pulled up in separate vehicles, one directly facing the corner, "surrounded" Stanley "on both sides," peppered him with questions, and "did not approach or begin questioning in a permissive manner" nor "casually approach, greet him, and then politely ask whether they could talk to him, ask him some questions, or whether he was willing to speak with them or answer any questions." *See also State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 (a uniformed officer made a constitutional seizure when he pulled into Roberts' driveway immediately behind Roberts' car, "thereby physically constraining [his] means and direction of travel").

¶77 The State says Fish's case is unlike the demand for and confiscation of identification that constituted a seizure in *Strom*. There, an officer stopped behind a van legally parked, approached and immediately asked the driver and Strom, a passenger, for ID, took their IDs, and told them to wait while he returned to his patrol car and ran a warrants check.

34

*Strom*, ¶ 5. Even though the officer did not physically block the van with his vehicle, activate his top lights, or draw a weapon, we held he seized Strom because the first thing he did was ask for her ID, take it, and tell her and the driver to wait, which would lead a reasonable person to feel she was not free to leave. *Strom*, ¶ 13.

¶78 Here, like in *Stanley* and *Roberts*, where officers physically constrained the defendants' means and direction of travel, Kammerzell and McGauley positioned their marked patrol vehicles to block or make difficult an exit from the casino parking lot. Further, they positioned their bodies directly outside the driver and passenger doors—surrounding the vehicle and effectively inhibiting Torres and Fish from exiting. Like in *Strom*, deputy McGauley instructed Torres, the driver, to "sit tight." Also like in *Strom*, Kammerzell opened his investigation by immediately asking Fish for ID and did not stop asking until Fish answered. While Kammerzell did not confiscate an ID like the officer in *Strom*, this is because Fish did not have one. Nevertheless, the principle is the same: instead of using an ID, Kammerzell used Fish's name and date of birth as soon as he obtained them to run a warrants check. Finally, unlike in *Rymal*, Fish did not, unprompted, volunteer his name, social security number, or that he had an outstanding warrant during a casual conversation with a single officer while standing outside in a parking lot. Instead, Fish identified himself after being asked *four* times to do so by an officer standing directly outside the door of the vehicle where he was a passenger while a second officer stood directly outside the driver's door questioning the driver and telling her to "sit tight." A reasonable person in Fish's position would not feel free to ignore

35

Kammerzell's persistent requests to identify, open the vehicle door, disengage from the encounter, and walk away from the scene.

¶79 The majority concludes that this case is like *State v. Wilkins*, 2009 MT 99, 350 Mont. 96, 205 P.3d 795, because Torres' car was already parked in the casino lot and the deputies therefore did not "initiate the stop" or activate their top lights or sirens when they arrived, and unlike *Strom*, because the deputies did not immediately demand identification upon contact. Respectfully, Deputy Kammerzell's body camera tells a different tale. As soon as the two-question welfare check was resolved in a matter of seconds, both deputies asked each vehicle occupant for their identification. The majority also likens this case to *Roberts*, but then concludes that the body cam video was "unclear" as to whether the deputies blocked the vehicle's exit. But whether the vehicle could actually navigate a five-point turn around the two deputy vehicles and exit the parking lot is immaterial—*Roberts* requires only that police physically *constrain* the means and direction of travel. It is the presence of two marked patrol vehicles parked in such close proximity behind and to the side of Torres' vehicle that would cause a person in Fish's position to feel that he was not free to leave the scene. Ultimately, the majority only "presumes" that a seizure occurred here. I disagree. Under the totality of circumstances, deputies unequivocally seized Fish in the Windiggers parking lot, triggering his constitutional protections.

## V. No Particularized Suspicion of Criminal Activity

¶80 Having concluded Fish was constitutionally seized when Kammerzell asked for his identification and name, I now turn to whether, at that time, Kammerzell had the requisite particularized suspicion to justify the seizure. Kammerzell's testimony, body camera

36

footage, and the totality of circumstances here establish that he did not. The seizure was therefore unconstitutional.

¶81 Particularized suspicion requires the officer have "(1) objective data and articulable facts from which he or she can make certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense." *State v. Pham*, 2021 MT 270, ¶ 21, 406 Mont. 109, 497 P.3d 217 (citing *Strom*, ¶ 15). When assessing whether particularized suspicion exists, we consider the quantity, quality, and substance of the information known to the officer at the time of the stop; hindsight knowledge is of no import. *Laster*, ¶ 12; *Zeimer*, ¶ 28. "The existence of particularized suspicion is determined by looking at the totality of the circumstances, but the related question of whether the circumstances indicated illegal activity is a question of law." *Pham*, ¶ 21; *State v. Wilson*, 2018 MT 268, ¶ 28, 393 Mont. 238, 430 P.3d 77. "The validity and legality of an investigative stop hinge upon the existence of particularized suspicion justifying the stop in the first place." *State v. Graham*, 2007 MT 358, ¶ 15, 340 Mont. 366, 175 P.3d 885.

¶82 At the time Deputy Kammerzell seized Fish, the only objective, articulable facts he knew were: (1) a casino employee called to report "a vehicle parked there for several hours with two people sleeping inside"; (2) the employee requested that someone "check on the[ir] welfare and remove them from the private property"; (3) a vehicle matching the caller's description was parked in the back of the casino parking lot during business hours; (4) two people were sleeping inside; and (5) when awakened, Fish said they had been gambling earlier, were napping, and were both "good." This information was not of

37

sufficient quantity or quality to give rise to a reasonable particularized suspicion of criminal activity. After all, Kammerzell admitted that the purpose of contact was *to remove* Fish from the property—in other words, to *notify* Fish that he was no longer welcome at the casino. Without notice, Fish could not have been knowingly trespassing. It is axiomatic that police cannot seize someone first and then develop the requisite particularized suspicion for the stop after the fact.

¶83 The crime of trespass requires that a person (1) knowingly (2) enters or remains unlawfully (3) upon the premises of another. Section 45-6-203, MCA. A person "enters or remains unlawfully" upon premises "when the person is not licensed, invited, or otherwise privileged to do so." Section 45-6-201(1), MCA. Privilege to enter or remain "may be revoked at any time *by personal communication of notice* by the landowner or other authorized person to the entering person." Section 45-6-201(1), MCA (emphasis added). *See also* § 45-6-201, MCA, Commission Comments ("criminal trespass is committed only if the offender, immediately prior to entry, receives oral or written notice that such entry is forbidden, or he remains upon the land after being notified to leave").

¶84 Once awakened by Deputy Kammerzell, Fish told him they had been gambling. Fish was therefore a casino patron, i.e., a business invitee on the premises during business hours.[11] *Accord State v. Spotted Bear*, 2016 MT 243, ¶¶ 34-39, 385 Mont. 68, 380 P.3d 810. As such, he was privileged to be on casino property and could not commit the crime of trespass until his privilege was revoked by personal notice, after which point his entry

---

[11] There was no testimony that the Windiggers Casino had a posted "No Trespassing" sign or was not open at the time deputies arrived and contacted Fish and Torres.

onto or remaining on the property would be "unlawful."  Sections 45-6-201, -203, MCA.

Deputy Kammerzell had no personal knowledge that Fish's privilege was previously revoked.  Instead, he knew only that a casino employee had requested Fish be awakened and *removed* from the property.  The employee did not report that Fish had been asked to leave and was trespassing.  The single fact that a casino employee wanted Fish removed from the property, without more, could not support an objectively reasonable inference that Fish had, was, or was about to be "engaged in criminal activity" where the crime of trespass requires "unlawfully" remaining after privilege has been revoked "*by personal communication of notice*."  Sections 45-6-201, -203, MCA.  In fact, notifying Fish of revocation was exactly what deputies were there to do, at the casino employee's request.

¶85    At the time of the seizure, Kammerzell was missing a crucial piece of information to support particularized suspicion that Fish was criminally trespassing—whether Fish was there unlawfully.  Fish's lawful or unlawful presence at the casino was the determinative factor on whether Kammerzell's suspicion was particularized and reasonable.  An officer may not detain an individual to investigate and ascertain whether a crime has been committed without first having reasonable particularized suspicion that it has.  Section 46-5-401(1), MCA (particularized suspicion is a prerequisite to a stop *and* any subsequent officer inquiry "to obtain or verify an account of the person's presence or conduct"); § 46-5-401(2), MCA (an officer may "request the person's name and present address and an explanation of the person's actions" *only* upon a lawful stop).  When Kammerzell seized Fish, he had no more than a generalized, undeveloped hunch that Fish was possibly trespassing.  This is not enough to meet the constitutional standard.  *Hoover*,

39

¶¶ 19, 28-30; *Zeimer*, ¶¶ 28, 46; *Reynolds*, 272 Mont. at 50-51, 899 P.2d at 542-43. Without confirmation that Fish's invitee status had been revoked, Fish's presence at the casino was no different than any other law-abiding citizen in the parking lot. This otherwise innocuous conduct could not be grounds for a constitutional seizure. *Zeimer*, ¶ 50; *Noli*, ¶¶ 32, 55. Accordingly, Kammerzell was not authorized under § 46-5-401, MCA, to ask for Fish's identity where the stop was not lawful in the first instance.

¶86 The majority contends that knowledge of whether Fish was previously asked to leave would have been necessary for "probable cause" Fish committed a criminal trespass, but that particularized suspicion requires less and Kammerzell was thus constitutionally permitted to seize Fish without knowledge of that requisite fact. True, particularized suspicion "is quantitatively different and less stringent than probable cause to arrest or conduct a search." *State v. Van Kirk*, 2001 MT 184, ¶ 14, 306 Mont. 215, 32 P.3d 735. Probable cause requires "sufficient facts and circumstances" to give rise to a "reasonable belief" that the subject has committed a crime; particularized suspicion requires only "inferences and a resulting suspicion" of the same. *State v. Murray*, 2011 MT 10, ¶ 14, 359 Mont. 123, 247 P.3d 721. But, regardless of the quantum of information necessary to form a reasonable "suspicion" or reasonable "belief," the common denominator of each standard is the same: involvement in *criminal* activity. The crime of trespass requires (1) knowingly (2) entering or remaining (3) unlawfully, i.e., without privilege. Kammerzell could not have a reasonable, particularized suspicion that Fish was committing the crime of trespass without facts supporting the elements of that offense. All

Kammerzell knew at the time of the seizure was that Fish was a casino patron and a casino employee had called dispatch to request deputies remove Fish from the property.

¶87 The majority relies on *State v. Carlson*, 2000 MT 320, 302 Mont. 508, 15 P.3d 893. There, we said that officers had particularized suspicion to investigate the presence of a van registered to Carlson parked on private property. However, the circumstances in *Carlson* were different than the circumstances here. There, the owner of the property called police "to report a suspicious vehicle" parked on his property that he had tried to move himself, but the windows were covered and the van locked. *Carlson*, ¶ 4. When the officer arrived, he met with the property owner who provided the van's license plate number. Upon calling it in, the officer learned that the van belonged to Carlson, who was "under investigation for illegal drug activities." *Carlson*, ¶ 5. The officer was "called back" by his supervisor and then later sent back to the property "for an investigation." *Carlson*, ¶ 6. Upon the officers' return, neighbors confirmed that the van belonged to Carlson. Officers observed someone in the van, asked her to come out, and Carlson exited and identified herself. *Carlson*, ¶¶ 7-9. When officers told her they were investigating a trespass, Carlson tried to move the van off the property. But officers detained her at gunpoint until a K-9 unit arrived to perform a drug sniff. *Carlson*, ¶¶ 10-12. The dog alerted to the presence of drugs, the van was later impounded and searched pursuant to a warrant, and Carlson was convicted on drug charges.

¶88 In answering whether Carlson was constitutionally seized and whether the seizure was justified, we answered both in the affirmative. Carlson was seized when she tried to move the van off property, but officers prevented her from doing so at gunpoint. *Carlson*,

41

¶¶ 11, 20. We said that, at that time, officers had "objective data which allowed them to infer that a trespass was occurring" pursuant to § 45-6-203, MCA, and they were thus authorized to detain Carlson for the purpose of investigating criminal trespass. *Carlson*, ¶¶ 22-24. However, we said that officers lacked any articulable particularized suspicion that there were drugs in the van and so detaining Carlson for 30 minutes until the K-9 unit arrived unlawfully extended "an otherwise lawful investigatory stop." *Carlson*, ¶¶ 21, 27. Instead, waiting for the K-9 unit and not citing Carlson for trespass "strongly suggest[ed] that the trespass investigation was pretext for performing a drug search." *Carlson*, ¶ 22.[12]

¶89     Here, unlike in *Carlson*, Fish was not parked on private residential property unlicensed and with no right to be there; he and Torres were business invitees—casino patrons—legally parked in the casino parking lot open to the public during business hours. As an invited patron, Fish's presence was privileged until the casino, through personal notice or posted signage, revoked that privilege. Unlike in *Carlson*, the casino employee did not "report a suspicious vehicle"; he or she asked only for a welfare check and to have the vehicle and occupants moved off the property. Unlike in *Carlson*, deputies had no knowledge whether, before calling law enforcement, any casino employee had contacted the vehicle occupants, tried to move the vehicle, or asked the occupants to leave and neither

---

[12] Despite correctly stating that criminal trespass required "Carlson knowingly remained unlawfully upon the premises of another," *Carlson*, ¶ 22, our *Carlson* analysis was not the model of clarity. For example, the facts established that, when contacted by police, Carlson tried to move the van off Bahm's property, but officers stopped her from doing so at gunpoint. Nevertheless, we said that officers "could have allowed Carlson to move the van off of Bahm's property *or charged Carlson with criminal trespass*, or both," but did neither. *Carlson*, ¶ 20 (emphasis added). It is unclear how, on those facts, officers could have "charged" Carlson with knowingly remaining unlawfully on Bahm's property when *the officers* did not allow her to move the van and instead forced her to remain there.

deputy was personally contacted by the property owner prior to the stop. And unlike in *Carlson*, the deputies had no information indicating the vehicle occupants were under investigation for illicit drug activity. Critically, unlike Kammerzell, the officers in *Carlson* had personal contact with the property owner who confirmed that the suspicious van was parked on his property unlawfully and therefore officers possessed an objectively reasonable suspicion that Carlson was trespassing.

¶90 Finally, Kammerzell's own statements on his body camera and testimony at the suppression hearing bely the State's after-the-fact justification for the stop. Though he testified at length regarding his "suspicion" that the substance in the baggy he found on Fish during the search was methamphetamine, Kammerzell did not once testify that he was suspicious Fish was committing the crime of trespass. The "trespass investigation" was, instead, an afterthought, as evidenced by Kammerzell's hearing testimony on defense cross-examination. To wit:

> Defense: I understand it's [the] prosecutor's position and you're giving testimony that supports that position that there was not actually a stop that occurred, that the Defendant was free to leave. . . . But if this was a situation where he didn't feel free to leave and a reasonable person wouldn't have felt free to leave, is there a crime that you were investigating at that time that would have justified stopping that individual and restricting his freedom to leave?

> Deputy: I guess the only crime that was being investigated at that time was trespassing. . . . [W]e were called to private property to remove people from private property and trespassing, staying there as unwelcome guests whether they knew it or not; that's why we were there talking to them.

> Defense: Okay. So you were there investigating a crime of trespass or you could have been there investigating the crime of trespass?

43

Deputy: I guess it was developing. . . . [W]e had gotten the call, when we arrived on scene, we didn't have every single detail as far as the wishes of the employees or anything like that.

Defense: [A]t that point in time . . . the wishes of the employees were not to have these individuals ticketed or charged with trespass. . . . [Y]our report and your testimony is that . . . the folks there through dispatch from what you're hearing is that they just want the people moved along, is that correct?

Deputy: Correct.

Defense: All right. And trespass of course, especially for a business, requires that a person knowingly remain there longer than they're welcome. And so, you also admitted that the folks at Windiggers and dispatch had never notified you that there was any prior request for these folks to move on, that was really what you were to be doing, is letting them know, hey, move along, right?

Deputy: Correct.

Defense: So, if you told them to move along and you came back a couple hours later would you agree that that is maybe where a potential trespass might be lurking because at that point they would have reason to know that they shouldn't be there and you would have reason to know that they know they shouldn't be there.

Deputy: Right.

Defense: But you're not really at that point if you['re] looking at a trespass charge with what you know at this point in time that we're talking about, correct?

Deputy: Correct. That is part of the reason I guess I had asked Mr. Fish for his ID, or to a friend to provide his information, was to I guess conduct that investigation of trespass, whether it was there or—at that point in time, or if it wasn't. I don't know if he had been called in earlier in the day that I wasn't aware of, and let's say he had been called in and asked to move along, and now they're back, that it's all—it's all part of the investigation for trespass.

44

Tellingly, instead of asking the one question that would have "developed" his otherwise only generalized suspicion of possible criminal activity—whether Fish had previously been asked to leave the casino—Kammerzell asked for Fish's name so that he could immediately run a warrants check instead.

¶91 An officer's after-the-fact description of suspicion as "developing" does not satisfy § 46-5-401, MCA; particularized suspicion must exist *before* the seizure and cannot be supplied later by speculation or hindsight. Permitting detention to determine whether the elements of a crime *might later be established* reverses the constitutional order of operations. Particularized suspicion must *precede* detention; it cannot be manufactured through detention. Additionally, constitutional analysis cannot rest on reasons the officer did not actually pursue. Kammerzell asked *no* questions regarding Fish's presence at the casino before seizing him and persisting in identifying him.

¶92 Further, the State's after-the-fact assertions that Kammerzell (1) "would need to know Fish's name to confirm or dispel if Fish had been previously asked to leave the Windiggers Casino . . . and had unlawfully returned" and (2) "would still need to know Fish's name so that it would be known to other law enforcement that Fish had been asked to leave" are belied by Kammerzell's own testimony. When asked what he would have done if Fish had refused to provide his name, Kammerzell said he would have "told him to have a nice day and leave the private property." This testimony establishes that Kammerzell *did not* need to know Fish's name for any of the State's after-the-fact asserted purposes and *did not* suspect Fish was committing a crime. Ruling out the asserted purpose

45

of investigating trespass, we are left with Kammerzell's only other asserted reason for asking Fish for his ID: to ascertain whether he had any warrants.

¶93 The record here shows that, instead of detaining Fish upon reasonable particularized suspicion of criminal trespass, Kammerzell detained Fish and persisted in trying to identify him because Kammerzell was suspicious he was "up to no good." The basis for Kammerzell's generalized, undeveloped hunch: Fish was evasive when asked for his name, changed the subject when questioned, and lit a cigarette. These are not constitutional grounds for a seizure under the Fourth Amendment and Article II, Section 11. *Hoover*, ¶¶ 19, 28-30; *Zeimer*, ¶¶ 28, 46; *Laster*, ¶ 12. Instead of confirming with casino employees—*or even Fish himself*—that Fish had been previously asked to leave the casino that day, the only inquiry Kammerzell made was his persistent requests for Fish's name and date of birth, which, immediately upon obtaining, he provided to dispatch to run a warrants check. After the welfare check was resolved, Kammerzell's subsequent request for ID was an investigatory curiosity and not constitutionally justified.

¶94 Under the totality of record circumstances here, Kammerzell effected an unconstitutional seizure when he detained Fish for investigative questioning in the Windiggers Casino parking lot without particularized suspicion Fish was committing any crime.

**Conclusion**

¶95 Particularized suspicion is a narrowly-delineated exception to constitutional probable cause and warrant requirements. The Fourth Amendment and Article II, Section 11 demand that we vigorously guard that standard and hold the State to its

46

constitutional responsibilities. The State did not establish here that Deputy Kammerzell had any objectively reasonable particularized suspicion that Fish was engaged in criminal activity when he persisted in asking Fish to identify himself in the Windiggers Casino parking lot. Because Kammerzell seized Fish without particularized suspicion, he obtained the methamphetamine evidence in violation of Article II, Section 11 and the Fourth Amendment. I would therefore reverse the District Court's denial of the motion to suppress and remand for further proceedings without the unlawfully obtained evidence. To hold otherwise invites warrant-fishing during welfare encounters and undermines the constitutional protections that Montanans have explicitly been provided.

¶96    I respectfully dissent.

/S/ KATHERINE M. BIDEGARAY

Justices Ingrid Gustafson and Laurie McKinnon join in the dissenting Opinion of Justice Katherine M. Bidegaray.

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON

Justice Laurie McKinnon, dissenting.

¶97    I join the well-reasoned dissent of Justice Bidegaray.

¶98    I am concerned, following the United States Supreme Court's decision in *Case v. Montana*, that the Court is unnecessarily opining on the "test" to be applied for the "community caretaker doctrine," particularly since the Supreme Court flatly rejected this Court's reasoning in *Case* and our application of the exact test from *State v. Lovegren*,

47

2002 MT 153, 310 Mont. 358, 51 P.3d 471 that the Court applies again here, albeit through *McClellan*.[1]  Opinion, ¶ 34.  Although *Case* involved a home entry, the Supreme Court discussed principles underlying the "emergency aid exception," which applies equally to encounters outside the home, and was careful to divorce the "emergency aid exception" from the "community caretaker doctrine."  The Court explained the rendering of emergency aid should not be viewed "through the lens generally used to consider investigatory activity." *Case*, 607 U.S. at ___, ___ S. Ct. at ___.  It held that "in *Caniglia*, we affirmed *Brigham City* even as we rejected a broader 'community caretaker' justification for warrantless home entries." *Case*, 607 U.S. at ___, ___ S. Ct. at ___.  Our precedent construing the community caretaker doctrine for out-of-home encounters contains much of the language cautioned against by the Supreme Court in *Case*.

---

[1] "On appeal, a divided Montana Supreme Court upheld the trial court's ruling that the officers' entry was lawful.  The majority analyzed the issue under its 'community caretaker doctrine.'  417 Mont. 354, 553 P.3d 985, 990 (2024).  It noted that a recent Fourth Amendment decision of this Court, *Caniglia* v. *Strom*, 593 U.S. 194, 198, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021), had rejected a 'community caretaking rule' allowing a warrantless home entry even absent a 'need to render emergency assistance' to an occupant.  But the Montana court thought its community-caretaker doctrine survived that holding because it demanded such an emergency.  Under that doctrine, the court explained, police could enter a home to do a 'welfare check' only when 'objective, specific and articulable facts' would lead an 'experienced officer [to] suspect' that a person inside 'is in need of help or is in peril.'  553 P.3d, at 990, 991.  And the court found that facts meeting that description existed here because of the likelihood of suicide.  See *id*., at 994.  The court rejected Case's alternative standard: that a police officer must have 'probable cause to believe' the occupant is in need of emergency aid.  *Id*., at 992.  The 'probable cause' locution, the court suggested, applies only when the police are 'engaged in a criminal investigation.'  *Ibid*.  The dissenting justices, by contrast, favored the proposed probable-cause rule, which they concluded the officers here did not satisfy.  See *id*., at 996, 998 (opinion of McKinnon, J.).  In the dissent's view, the court's different approach resembled the 'mere reasonable suspicion' standard applicable to comparatively non-invasive street stops.  *Id*., at 999.  That standard, the dissent thought, was too easily met to support a warrantless entry into a home.  See *id*., at 996, 999." *Case*, 607 U.S. at ___, ___ S. Ct. at ___.

¶99 While the *Lovegren* test, which involved a vehicle encounter, applied by the Court here may well remain Montana's "community caretaker" test, in my opinion it is unwise to reinforce as the applicable test one that has been specifically rejected by the Supreme Court when it has been neither argued nor is an issue on appeal. I would simply point out that the parties do not dispute that law enforcement could perform a welfare check on Fish, leaving for another day any discussion about the appropriate test to be applied.

/S/ LAURIE McKINNON